**Michael P. PARENTI, Plaintiff, Appellant,**

v.

**Joseph J. PONTE, et al., Defendants, Appellees.**

**No. 83–1531.**

United States Court of Appeals, First Circuit.

Argued Dec. 5, 1983.

Decided Feb. 8, 1984.

As Amended on Denial of Rehearing March 8, 1984.

22

Thomas E. McDonald, Boston, Mass., with whom Samuel J. Armstrong, and Warner & Stackpole, Boston, Mass., were on brief, for plaintiff, appellant.

Martin E. Levin, Asst. Atty. Gen., Boston, Mass., Criminal Bureau, with whom Francis X. Bellotti, Atty. Gen., Frederick W. Riley, Asst. Atty. Gen., Chief, Criminal Bureau, and Barbara A.H. Smith, Asst. Atty. Gen., Chief, Criminal Appellate Division, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and MALETZ,* Senior Judge.

* Of the United States Court of International Trade, sitting by designation.

BOWNES, Circuit Judge.

Plaintiff Michael Parenti, an inmate at the Massachusetts Correctional Institution at Walpole, brought this action under 42 U.S.C. § 1983 in the United States District Court for the District of Massachusetts. His complaint alleged that defendants, various officials and employees of the Department of Correction, had denied him due process by transferring him to the departmental segregation unit (DSU) without a fair hearing. The district court, 565 F.Supp. 987, found that the applicable state statute and regulations created no liberty interest protected by the due process clause of the fourteenth amendment, and dismissed the complaint for failure to state a claim.

The essential facts are not in dispute. On March 6, 1981, immediately following an incident at the prison, correction officer Tim Hall filed a disciplinary report charging Parenti with disruptive conduct. On April 29, 1981, a disciplinary hearing was held at which Hall, as the reporting officer, gave testimony against Parenti. The Disciplinary Board found that Parenti had committed a violation, and ordered sanctions of fifteen days in isolation and loss of forty-five days' good-time credit. The Board also recommended review by the Department Classification Board for transfer to the DSU.

On May 20, 1981, Parenti appeared before the Department Classification Board, which consisted of three members, including Hall; no objection was raised to Hall's participation at that time. The Board voted 3–0 to recommend Parenti's transfer to the DSU. On June 2, 1981, Parenti received written notification that the Commissioner of Corrections had authorized his transfer to the DSU. On August 27, 1981, Parenti reappeared before the Department Classification Board for a ninety-day review; again, the Board included Hall as a member. This time, Parenti objected to Hall's participation on the ground that he had testified during the previous Disciplinary Board hearing as a witness against him. The re-

quest that Hall be removed from the Department Classification Board proceedings was denied, and the Board voted to recommend that Parenti remain in the DSU for an additional sixty days. On September 10, 1981, Parenti received written notification that the Commissioner had approved the extension. After the next periodic review hearing on October 29, 1981, the Department Review Board recommended that Parenti be transferred back to the general population; this was approved by the Commissioner on November 6, 1981.

On appeal, Parenti does not challenge the procedure or the results of the disciplinary hearing, nor does he argue that the Commissioner lacked grounds for authorizing his transfer to the DSU. His sole contention is that he was denied an impartial hearing by Hall's presence on the Department Classification Board that recommended his transfer. We must, therefore, decide whether this contention gives rise to a due process violation claim.

█ The first question is whether Parenti had any liberty interest protected by the due process clause in remaining in the general prison population. It is clear that any liberty interest on Parenti's part must be grounded in state law, because the due process clause does not in and of itself guarantee any particular confinement status to a duly convicted prison inmate.

> As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. The Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.

*Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *see also Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In *Meachum* and *Montanye,* the Court held that transfers of inmates from one prison to another within a state did not implicate a liberty interest inherent in the due process clause. The Court rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause," because that "would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538.

Apart from the due process clause itself, the Court has also recognized a potential source of a protected liberty interest in state law. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court noted that "the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior," *id.* at 557, 94 S.Ct. at 2975, and proceeded to hold that the prisoners' interest in good time was a liberty interest protected by the due process clause. In both *Meachum* and *Montanye,* however, the applicable state law was held not to create a protected liberty interest because it did not limit the discretionary prison transfers to specific instances of misconduct or other events. *Meachum,* 427 U.S. at 226–27, 96 S.Ct. at 2539–40; *Montanye,* 427 U.S. at 243, 96 S.Ct. at 2547. More recently, the Court has noted that

> a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." ... If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," ... the State has not created a constitutionally protected liberty interest.

*Olim v. Wakinekona,* —— U.S. ——, ——, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (citations omitted).

The Massachusetts statute governing DSU transfers provides:

At the request of the superintendent of any correctional institution of the commonwealth, the commissioner may authorize the transfer, for such period as he may determine, to a segregated unit within any correctional institution of the commonwealth, of any inmate whose continued retention in the general institution population is detrimental to the program of the institution.

Mass.Gen.Laws Ann. ch. 127, § 39. We have held that the statute confers "broad statutory discretion" on the Commissioner, and thus does not in itself create a protected liberty interest. *Four Certain Unnamed Inmates of Massachusetts Correctional Institution v. Hall,* 550 F.2d 1291, 1292 (1st Cir.1977) (per curiam).

The regulations enacted under the statute require that the same procedures be followed when the Department Classification Board recommends a DSU transfer as when it recommends a transfer to another prison within the state. 103 C.M.R. §§ 420.13(2) & 421.07(3). These procedures have remained essentially unchanged since they were implicitly held not to create a liberty interest by the Supreme Court in *Meachum,* 427 U.S. at 226–27, 96 S.Ct. at 2539. Although we have noted that "the Court's decision [in *Meachum*] did not purport to be the last word on the state of Massachusetts law," *Lombardo v. Meachum,* 548 F.2d 13, 15 (1st Cir.1977), we have taken that decision as "commanding authority" for the proposition that Massachusetts law imposes no substantive standards on the Commissioner's discretion to transfer inmates. *Four Certain Unnamed Inmates,* 550 F.2d 1292, *see also Daigle v. Hall,* 564 F.2d 884, 885–86 (1st Cir.1977).

■ If the procedural requirements for Department Classification Board hearings were the only regulations governing DSU transfers, we would hold without hesitation that no protected liberty interest is implicated by such transfers. Procedural guidelines standing alone do not create a protected liberty interest. *Hewitt v. Helms,* —— U.S. ——, —— – ——, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Olim,* —— U.S. at ——, 103 S.Ct. at 1747. In *Hewitt,* however, the Court found that the state had "gone beyond simple procedural guidelines" to require that "certain procedures 'shall,' 'will,' or 'must' be employed" in "language of an unmistakably mandatory character," in conjunction with "specified substantive predicates—*viz.,* 'the need for control,' or 'the threat of a serious disturbance.'" *Hewitt,* —— U.S. at ——, 103 S.Ct. at 871. The Court stated that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Id.*

In light of *Hewitt,* we must reexamine the Massachusetts prison regulations relating to DSU transfers. They are as follows:

(1) A resident may be transferred to a departmental segregation unit after a finding by the commissioner that the record of the resident or other reliable information indicates that:

(a) The resident poses a substantial threat to the safety of others; or

(b) The resident poses a substantial threat of damaging or destroying property; or

(c) The resident poses a substantial threat of interrupting the operation of the state correctional facility if he is confined in the general population of any state correctional facility.

(2) Notwithstanding any rule or regulation of the department to the contrary, a resident shall not be transferred to a departmental segregation unit for committing a specific punishable offense unless a disciplinary board has found him guilty of such specific offense and imposed a sanction pursuant to 103 CMR 430.00 (*Disciplinary Process, Rules and Regulations*), and the commissioner has made a finding in accordance with 103 CMR 421.-07(1)....

(3) Upon receipt of a request from a superintendent to the commissioner to transfer a resident to a departmental segregation unit, the rules set forth in 102 CMR 420.13(2) (*Guidelines for the Opera-*

tion of the *Reclassification Process—Intra-Facility and Interfacility*), shall be followed in determining whether to authorize the transfer of the resident to such unit . . . .

103 C.M.R. § 421.07 (*Transfers to a Departmental Segregation Unit*).

 We think that § 421.07 imposes both substantive and procedural restrictions on the exercise of the Commissioner's discretion to transfer inmates to a DSU. A preceding explanatory section makes it clear that inmates are not to be transferred routinely but may "require" transfer in "certain limited instances." 103 C.M.R. § 421.-05. Under § 421.07(1), those limited instances are defined in terms of a finding by the Commissioner, on the basis of the record or other reliable information, that a "substantial threat" is posed to persons, property, or prison operation. We do not think that this section may be fairly read as an open-ended, merely illustrative list; the substantive criteria would otherwise have no meaning. Section 421.07(2) imposes the additional requirement of a prior disciplinary hearing and sanctions where a DSU transfer is recommended in consequence of "a specific punishable offense." This provision would also become mere surplusage if the Commissioner had absolute discretion to transfer inmates on other pretexts. Finally, in conjunction with the substantive predicates of subsections (1) and (2), § 421.07(3) incorporates in mandatory terms the detailed procedural requirements of § 420.-13(2) concerning Department Classification Board hearings. We conclude that § 421.07 creates a liberty interest under the Supreme Court's holding in *Hewitt.*

The second part of our inquiry is whether Parenti's liberty interest encompassed a right to exclude Hall, as a reporting officer, from the Department Classification Board. In *Hewitt,* the Court applied the standard from *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), to determine what process was due: it balanced the inmate's interest, the prison administration's interest, and the value of procedural requirements. *Hewitt,* —— U.S. at

——– ——, 103 S.Ct. at 873. The Court noted that the inmate "was merely transferred from one extremely restricted environment to an even more confined situation," that the transfer was independent of disciplinary sanctions, and that there was no adverse effect on parole. It concluded that the inmate's private interest was "not one of great consequence." *Id.* at ——, 103 S.Ct. at 872. The Court found a strong administrative interest in guaranteeing the safety of prison guards and other inmates, as well as in isolating the prisoner pending investigation of misconduct charges. *Id.* The decisions and judgments involved were largely " 'purely subjective evaluations and . . . predictions of future behavior,' " *id.* (citation omitted), and would thus not "have been materially assisted by a detailed adversary proceeding." *Id.* The Court concluded that

an informal, nonadversary evidentiary review [was] sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at ——, 103 S.Ct. at 874 (footnote omitted).

 Under the Massachusetts regulations, the Department Classification Board makes recommendations to the Commissioner concerning transfers to a special classification status such as a DSU. 103 C.M.R. § 420.04(2). The Board holds a reclassifica-

tion hearing at which the inmate whose transfer is being considered may appear, testify in his own behalf, and offer written testimony of other witnesses. *Id.,* § 420.-13(2)(c) & (i). If the Board decides to recommend a DSU transfer, it must notify the inmate of its recommendation and reasons. *Id.,* § 420.13(2)(k). The inmate then has an opportunity to submit a written statement of objections to the recommendation, which is forwarded to the Commissioner along with the reports of the Board and the Deputy Commissioner. *Id.,* § 420.13(2)(*l*)–(n). Significantly, the Board's recommendation is in no way binding on the Commissioner, who may

> approve or disapprove of the transfer[,] or ... make, based on all the reports and information that are presented to him as required by the rules, such other decisions as he deems appropriate respecting the transfer of the [inmate].... Where the Commissioner considers information not presented by the Board or the Deputy Commissioner for Classification and Treatment, he must indicate such in his written decision.

*Id.,* § 420.13(2)(p). The inmate is entitled to written notification of the Commissioner's decision. *Id.*

■ Parenti does not claim that the procedural requirements for reclassification hearings were not followed in his case, nor that the Commissioner lacked an adequate predicate for the transfer decision. His only claim is that Hall was allowed to sit on the Department Classification Board. In our view, the regulations require merely that the classification hearing be held; they do not require that specific persons be included on or excluded from the Board, nor that Board members be impartial. The composition of the Department Classifica-

tion Board, unlike that of the Disciplinary Board,[1] lies in the discretion of the Deputy Commissioner, and the only requirement is that the members be "experienced in the area of classification." 103 C.M.R. § 420.-01(6). This does not violate due process, for the Board is not responsible for deciding whether to transfer inmates: it merely makes nonbinding recommendations to the Commissioner. Because the Board's function is "purely advisory" and the Commissioner is "the only decisionmaker" under 103 C.M.R. §§ 420.13(2) & 421.07, we find no significance in "the fact that the prison regulations require a particular kind of [reclassification] hearing" before the Commissioner makes his determination. *Olim,* —— U.S. at ——, 103 S.Ct. at 1747. Parenti's due process rights extended to notice of the impending transfer decision and an opportunity to submit his views opposing the Board's recommendation to the Commissioner. In the absence of any regulation prohibiting Hall from sitting on the Department Classification Board or granting Parenti the right to have him removed bias, we decline to read such requirements into the due process clause. Parenti's complaint, therefore, failed to state a claim.

*Affirmed.*

---

1. The composition of the Disciplinary Board, as well as other procedural aspects of disciplinary proceedings, are governed by a separate set of regulations, 103 C.M.R. § 430. Had Hall appeared as a member of the Disciplinary Board, Parenti would have been entitled to object on grounds of partiality, and the chairman would have been obliged to remove him if there were substántial reasons supporting the claim. *Id.,* § 430.13(2). *Cf. Merritt v. De Los Santos,* 721 F.2d 598 (7th Cir.1983) (regulations and due process infringed where investigating officer sat on disciplinary committee). The disciplinary procedure regulations, however, are not applicable to classification hearings, and the Department Classification Board does not review Disciplinary Board findings or sanctions. Nor is transfer to a DSU among the sanctions that the Disciplinary Board could impose for a disciplinary violation. 103 C.M.R. § 430.23.