DAVID MARTINO *vs.* WILLIAM HOGAN & others.[1]

No. 92-P-1804.

Suffolk. April 11, 1994. - December 13, 1994.

Present: DREBEN, KAPLAN, & LAURENCE, JJ.

*Imprisonment*, Transfer of prisoner. *Civil Rights*, Immunity of public offi-
cial. *Public Officer. Constitutional Law*, Imprisonment. *Administrative
Law*, Regulations.

Discussion of State and Federal cases addressing the issue whether a State
prisoner has a State cause of action under 42 U.S.C. § 1983 against
prison authorities arising out of administrative (as distinguished from
disciplinary) transfers of the prisoner. [714-717]
Where in 1980 no Federal constitutional "liberty interest" was recognized
with respect to prison authorities' transfer of a State prisoner to an out-
of-State prison, no claim for damages as a result of such a transfer
under 42 U.S.C. § 1983 could be maintained. [715]
Where a State-created Federal constitutional "liberty interest" with re-
spect to State prison authorities' administrative transfers of prisoners
was not "clearly established" in Massachusetts in 1983, prison author-
ity defendants in a claim under 42 U.S.C. § 1983 involving a 1983
transfer of an inmate were entitled to qualified immunity for their ac-
tions [717-719]; in any event, where none of the defendants actually
exercised control or direction over the transfer, they could not be held
personally liable [719-720].
A Superior Court judge correctly ruled that a State prisoner could not
base a claim for money damages, arising out of prison authorities' ad-
ministrative transfers of the prisoner, on the Commonwealth's Declara-
tion of Rights, in light of the availability of 42 U.S.C. § 1983 and
G. L. c. 12, §§ 11H & 11I. [720]
No basis for a claim of personal liability of State prison authorities by
reason of their breach of Department of Correction rules and regula-
tions relating to administrative transfers of prisoners could be implied
from the rules and regulations themselves. [720-721]
Certain transfers of a State prisoner by prison authorities to segregation
units which were not the subject of explicit regulations that could cre-
ate liberty interests protective of inmates could not be the subject of a
claim for money damages under 42 U.S.C. § 1983. [721]

---

[1]Louis Berman and Michael Fair.

CIVIL ACTION commenced in the Superior Court Department on December 30, 1986.

The case was heard by *John P. Sullivan,* J., on motions for summary judgment.

*Dennis Shedd* for the plaintiff.

*Stephen G. Dietrick* for the defendants.

KAPLAN, J. In this action principally under the Federal civil rights statute, 42 U.S.C. § 1983 (1988), the plaintiff, David Martino, a former prison inmate, sought to charge the defendant Commissioners of Correction with individual liability for damages because of the failure of subordinates in the prison system to accord him hearings in connection with his administrative (as distinguished from disciplinary) transfers. The two notable transfers were, first, in 1980, to an out-of-State prison in Rhode Island, the second, in 1983, to placement in a departmental segregation unit (D.S.U.) in M.C.I., Walpole. On cross motions for summary judgment, a Superior Court judge held for the defendants, and we affirm. As to the 1980 transfer, no pertinent Federal constitutional right was recognized at the time. Regarding the second transfer, although a State-created Federal constitutional "liberty interest" was later recognized in other circumstances in the Pennsylvania prison system, such an interest was not "clearly established" for the instant situation in Massachusetts, and the defendants could properly assert their qualified immunity. At all events, the defendants did not themselves participate in the claimed deprivations so as to be held individually liable for damages (the general doctrine of respondeat superior is not applicable). Claims under § 1983 as to other transfers besides the two mentioned also fail. The plaintiff cannot base a claim directly upon art. 12 of the Massachusetts Declaration of Rights, nor can he read a claim for damages into the departmental regulations themselves.

*Facts.* The basic facts may be set out in tabular form.

*1976*

March 28. Martino sentenced to M.C.I., Walpole, for twelve to fifteen year term for robbery; placed in general population.

*1980*

September 12. Moved to a segregation unit at the Southeastern Correctional Center. (The transfer apparently was part of an effort to rid Walpole of troublemakers; Martino was suspected of being a drug dealer and influential with other inmates.)

September 19. Moved to segregation unit at M.C.I., Concord, called "department nine."

November 3. Moved to Adult Correctional Center (A.C.I.) in Rhode Island, a maximum security prison.

*1981*

February 24. Placed in new A.C.I. segregation unit, called "High Security Center."

June 10. Apparently returned to general A.C.I. population (record not entirely clear).

*1983*

August 2. Moved to M.C.I., Walpole, placed in D.S.U. (Martino was moved because he was suspected of being a cause of a major disturbance at A.C.I.)

September 15. Moved to Institutional Disciplinary Unit (I.D.U.), another segregation unit in M.C.I., Walpole.

November 10. Received a D.S.U. classification board hearing, which recommended classification to the D.S.U. Recommendation was approved by the Commissioner on November 18, 1983, with notice to Martino on November 23. This was Martino's only transfer or placement hearing while in custody. Nevertheless Martino remained in I.D.U.

*1984*

January 3. Martino released from custody.

On December 30, 1986, nearly three years after his discharge, Martino commenced the present action in Superior Court against Hogan, Berman, and Fair, who were each successively Commissioner of Correction in the period of Martino's incarceration.[2] The gravamen of the (amended) complaint was that he was deprived of hearings and related procedures allegedly due him in connection with the transfers. Although the complaint sought declaratory and injunctive relief besides money recovery, only the latter prayer could survive, the trial court having concluded without challenge that the other prayers became moot upon the plaintiff's discharge from custody.

The defendants answered with denials and defenses including the defense of "qualified immunity." The plaintiff moved for summary judgment to establish liability, reserving damages, and the defendants cross-moved for summary judgment dismissing the action. The judge denied the plaintiff's motion and allowed the defendants', and from the judgment for the defendants the plaintiff appeals.[3]

A. *Rhode Island and D.S.U. transfers.* It will be convenient to begin with the administrative transfers to Rhode Island (November 3, 1980) and to placement in Walpole D.S.U. (August 2, 1983), which appear stronger for Martino's case than the other transfers. In both instances the prison personnel failed to comply with departmental regulations that called expressly for pretransfer hearings and connected procedures. The plaintiff contends that he is entitled to compensation for each of these violations; he rests alterna-

---

[2]Hogan was Commissioner from September 16, 1979, to September 21, 1980; Berman from September 22, 1980, to April 25, 1981; Fair from April 26, 1981, to July 9, 1991.

[3]We are mindful of the allocation of burdens on motions for summary judgment. See *Pederson* v. *Time, Inc.,* 404 Mass. 14, 16-17 (1989); *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 711-716 (1991). For the most part the issues in the case reduce to propositions of law.

tively on § 1983, the Commonwealth's Declaration of Rights, and the regulations proper.[4]

1. *Section 1983.* This allows equitable and legal relief against a State official who deprives any person of rights secured by the Federal Constitution.[5]

*a.* In *Meachum* v. *Fano*, 427 U.S. 215 (1976), the Court considered whether Massachusetts inmates who had suffered administrative prison-to-prison transfers to "less favorable institution[s]" (*id.* at 222), e.g., Norfolk to Walpole, without being accorded a pretransfer hearing as provided by the departmental regulations, could claim a deprivation of a Federal constitutional right. The Court said the plaintiff had no right deriving from the due process clause in itself. The thought was expressed thus in a cognate case, *Montanye* v. *Haymes*, 427 U.S. 236, 242 (1976): "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. The Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." (This remains the law today.) The Court suggested the possibility that a State might create a "liberty interest" in favor of inmates by granting them by law a given kind or level of treatment — whether as to transfers or other matters — amounting to an entitlement (or expectation) deserving protection under the due process clause, and hence under § 1983. *Meachum* v.

---

[4]The plaintiff has abandoned his reliance on the State Civil Rights Act, G. L. c. 12, §§ 11H, 11I. This was inapplicable for the reason, among others, that no "threats, intimidation, or coercion" had been involved. See *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333-334 (1989).

[5]Section 1983 states in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

*Fano, supra* at 226, 229. But the Court thought Massachusetts had not done so in the particular case. *Id.* at 226-228.

The *Meachum* case remained authoritative in 1980 when the prison-to-prison Rhode Island transfer occurred, although the applicable departmental regulations for such transfers had been somewhat revised in 1978.[6] The First Circuit Court of Appeals acknowledged this when it wrote in 1984: "[W]e have taken that decision as 'commanding authority' for the proposition that Massachusetts law imposes no substantive standards on the Commissioner's discretion to transfer inmates." *Parenti* v. *Ponte*, 727 F.2d 21, 24 (1st Cir. 1984) (quoting from *Four Certain Unnamed Inmates of M.C.I., Walpole,* v. *Hall,* 550 F.2d 1291, 1292 [1st Cir. 1977] [per curiam], and referring also to *Daigle* v. *Hall,* 564 F.2d 884, 885-886 [1st Cir. 1977]). The same point, that *Meachum* was the constitutional measure as to Massachusetts interprison transfers, was recognized in *Nelson* v. *Commissioner of Correction,* 390 Mass. 379, 397 (November 10, 1983). Thus the Rhode Island transfer was clear of § 1983.

*b.* A definite movement toward realizing the suggestion in *Meachum* was signalled by the decision in *Hewitt* v. *Helms,* 459 U.S. 460 (February 22, 1983).[7] This was not a prison-to-prison case; rather an inmate of a Pennsylvania prison com-

---

[6]At the time of the *Meachum* decision (1976), the applicable Massachusetts departmental regulations equated an out-of-State transfer with local transfer to a prison of higher custody status (Departmental Order 4400.1, § 1.10 [1974]) and thus required a pretransfer hearing and related procedures such as written notice of hearing, right to attend, to testify and present evidence, etc. (Departmental Order 4400.2, § 4.2a [1974]). However, the regulations did not describe with clarity the standards for such transfers, see *Meachum,* 427 U.S. at 226-228.

The regulations promulgated in 1978 were similar, 103 Code Mass. Regs. §§ 420.11, 420.13(2) (1978).

Under the New England Interstate Correctional Compact a prisoner transferred between two New England States was entitled to receive in the transferee State sundry procedures that would be due him in the transferor State and (as of 1979) the *Meachum* doctrine applied. See *Sisbarro* v. *Warden, Mass. State Penitentiary,* 592 F.2d 1, 2-4 (1st Cir. 1979). (The Compact was amended in 1993 to give it nationwide scope.)

[7]This was a 5-4 decision. The dissenters would have adopted general views rather more favorable to inmates about procedural protections before

plained of his removal from the general population and placement in a certain administrative segregation unit and his retention there allegedly without adequate process. *Id.* at 463-466. The Court said a State through statute, regulation, or rule could create a liberty interest by defining the specific substantive purposes to be achieved by proposed official action, say as to transfers, and mandating — not merely intimating, suggesting, or recommending — a procedure that was "due," leading to decision whether the substantive standards were met on the particular facts. *Id.* at 469-472. The Court spoke of Pennsylvania's somewhat dubious but adequate satisfaction of the dual requirements: "But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Id.* at 472. On this understanding the Court examined the pertinent Pennsylvania regulations and found that the State had indeed raised a liberty interest comprising substance and procedure. *Id.* at 470-472. But the process the inmate had in fact received, although rather informal or rudimentary, was "due." *Id.* at 472-477. Accordingly the § 1983 action failed in the end.

In *Olim* v. *Wakinekona*, 461 U.S. 238 (April 26, 1983), the Court found that Hawaii, unlike Pennsylvania, had not gone the distance to create a liberty interest in situations of out-of-State transfer.

Shortly after the *Hewitt* and *Olim* decisions, the question of the constitutional validity of an inmate's placement in a Walpole D.S.U. (similar to the placement herein on August 2, 1983) arose in a § 1983 action in the United States District Court for Massachusetts. *Parenti* v. *Ponte*, 565 F. Supp. 987 (D. Mass. June 17, 1983), aff'd, 727 F.2d 21 (1st Cir.

---

confinement in administrative segregation.

A three-judge court had in 1978 found a protected interest in certain inmate transfers, using some of the reasoning in *Meachum*. The Supreme Court affirmed, but without opinion, leaving the basis unclear. *Wright* v. *Enomoto*, 462 F.Supp. 397 (N.D. Calif. 1976), aff'd, 434 U.S. 1052 (1978). The significant development came, as noted, with the *Hewitt* case; and see the citation of the *Wright* case in *Hewitt*, 459 U.S. at 469.

1984). The judge acknowledged that *Hewitt* had a bearing, but in light of the "commanding authority" (*Four Certain Unnamed Inmates of M.C.I., Walpole* v. *Hall,* 550 F.2d at 1292) in the Circuit he declined to hold that the local regulations created a liberty interest. *Parenti* v. *Ponte,* 565 F. Supp. at 988-989.

A contrary ruling on the point, although by way of dictum, came in the *Parenti* appeal in the Court of Appeals. The court, through Judge Bownes, examined the departmental regulations governing the D.S.U. transfers and found the stated substantive purposes firm enough, and the related prescribed process both mandated and adequate.[8] However, the plaintiff conceded that the regulations had been followed according to their terms; his grievance was that he had been denied the right to disqualify a member of the classification board for claimed bias because this person had previously testified against him. This matter of disqualification was not dealt with in the regulations and the court thought denial of the challenge to the board member did not offend due process. Accordingly, the § 1983 action failed. *Parenti* v. *Ponte,* 727 F.2d at 25-26.

Judge Bownes' analysis for the court regarding D.S.U. transfers in light of *Hewitt* seems to us persuasive, but we are not to move his conclusion back to August 2, 1983, when the D.S.U. transfer was made in the present case. At that time the liberty-interest question in relation to the local regulations had not been settled — and surely not clearly settled; it was in dispute, with the Commonwealth through the Attorney General defending the negative in Federal courts. It is noteworthy, too, that as late as November, 1983, the Su-

---

[8]The departmental regulations of 1978 regarding transfers to D.S.U. refer to the procedures for transfer to facilities of higher custody status, 103 Code Mass. Regs. § 420.13(2) (1978) (see note 6, second par., *supra*), and list as criteria for transfer to D.S.U. that "[t]he resident poses a substantial threat to the safety of others; . . . poses a substantial threat of damaging or destroying property; or . . . poses a substantial threat of interrupting the operation of the state correctional facility if he is confined in the general population of any state correctional facility." 103 Code Mass. Regs. § 421.07(1) (1978).

preme Judicial Court had expressly withheld a pronounce-
ment on the question, although it had noted some resem-
blances between the Pennsylvania regulations in *Hewitt* and
some regulations of the Department of Correction. See *Real
v. Superintendent, M.C.I., Walpole,* 390 Mass. 399, 407;
*Lamoureux* v. *Superintendent, M.C.I., Walpole,* 390 Mass.
409, 416-418; *Royce* v. *Commissioner of Correction,* 390
Mass. 425, 428 n.7 (all decided November 10, 1983).[9]

c. With an uncertain question at the critical time whether
the Federal Constitution, in the guise of a protected liberty
interest, modified (without of course eliminating) their dis-
cretion in making D.S.U. transfers, the defendant officials
should not be cast personally in damages by the light of a
later determination of that question. They are entitled to the
qualified immunity pleaded in their answer. As the Court
said in *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (1982), "We
. . . hold that government officials performing discretionary
functions, generally are shielded from liability for civil dam-
ages insofar as their conduct does not violate clearly estab-
lished statutory or constitutional rights of which a reasonable
person would have known." The Court went further in *An-
derson* v. *Creighton,* 483 U.S. 635, 639-641 (1987), to say
that a government official may claim the same immunity if,
although a clear statutory or constitutional rule applies, a
reasonable official would have believed that his or her con-
duct was legal.[10] See, in accord on the basic character of the

---

[9]It has been suggested that Martino's transfer to Walpole D.S.U. should
be viewed as his placement there on "awaiting action status." The depart-
mental regulations permitted such placement pending a hearing or an in-
vestigation on an inmate's alleged disciplinary offense, a transfer to a facil-
ity of higher custody status, or imposition of the sanction of isolation time.
103 Code Mass. Regs. § 420.13(2)(b), 430.19 (1978). The question
whether a liberty interest had been created regarding placement in "await-
ing action status" was still in litigation until 1986, when it was decided in
the inmate's favor. *Stokes* v. *Fair,* 795 F.2d 235 (1st Cir. 1986). In *Ken-
ney* v. *Commissioner of Correction,* 393 Mass. 28 (September 13, 1984),
the court ruled that the D.S.U. could not be used as the location for await-
ing action status.

[10]Note that qualified immunity does not stand in the way of relief other
than money damages. See *Lugo* v. *Alvarado,* 819 F.2d 5, 7 (1st Cir.
1987).

qualified immunity, *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield*, 401 Mass. 26, 30-34 (1987), cert. denied, 485 U.S. 906 (1988); *Dobos* v. *Driscoll*, 404 Mass. 634, 646-650, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989); *Duarte* v. *Healy*, 405 Mass. 43, 46-47 (1989).

*d.* Finally, even were it assumed that the constitutional rule was "clearly established" and violated, so that qualified immunity did not attach, the defendants could be held individually liable for damages for the infractions under § 1983 only if they themselves participated directly in them.[11] The subject was reviewed in *O'Malley* v. *Sheriff of Worcester County*, 415 Mass. 132, 142-143 (1993), where the court emphasized that the claimant must establish the official's "personal involvement in the constitutional violation," which at a minimum must mean "personal knowledge" of the violation. *Id.* at 143. Speaking of possible personal liability of supervisory personnel, the court said in *Voutour* v. *Vitale*, 761 F.2d 812, 820 (1st Cir. 1985) (per curiam), "the supervisor must demonstrate at least gross negligence amounting to deliberate indifference, and . . . this conduct must be causally linked to the subordinate's violation of plaintiff's civil rights." See also *Dobos* v. *Driscoll*, 404 Mass. at 648-650 & n.8; *Guzman* v. *Cranston*, 812 F.2d 24, 26 (1st Cir. 1987); *Miltier* v. *Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). Reasons for the rule limiting liability to situations where the supervisor actually exercises control or direction over acts, or causes an act to occur, are discussed in *Monell* v. *New York City Dept. of Social Servs.*, 436 U.S. 658, 690-695 (1978).

In the present case, the defendants as Commissioners were not on the scene of any of the claimed violations. Thus Commissioner Fair stated in his affidavit that he did not know of the alleged violations and did not participate in them. The

---

[11]To claim money damages against the official, he or she must be sued in a personal rather than official capacity. See *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *O'Malley* v. *Sheriff of Worcester County*, 415 Mass. 132, 140-142 (1993). Although there is reason to doubt whether the present complaint is so framed, it is not necessary to press the point.

plaintiff points out that by regulation certain transfers are to be made by formal approval of the Commissioner on recommendation of subordinates but this is hardly enough to charge the Commissioner with personal liability for a breach of (an assumed) constitutional standard that, unknown to him, occurred locally in operations in the field. See *Sanders v. Brewer*, 972 F.2d 920, 923 (8th Cir. 1992).

2. *State Constitution.* Alternatively, the plaintiff tried to base a claim for money damages on the Commonwealth's Declaration of Rights. As noted, no claim in the present context was recognized based on the Federal due process clause simpliciter. There has been discussion of grounding a cause of action on the State Constitution for violation of its provisions where no statutory avenue for enforcement has been fashioned and made available. See *Phillips* v. *Youth Development Program, Inc.*, 390 Mass. 652, 657-660 & n.4 (1983); *Layne* v. *Superintendent, M.C.I., Cedar Junction*, 406 Mass. 156, 159-160 (1989). No actual decision on that line has reached the present situation or anything near it. To be considered before such a step is taken is the fact of the existence of § 1983 and the State analogue, our Civil Rights Act, G. L. c. 12, §§ 11H & 11I: these may be thought, as it were, to occupy the field. Nor, as the judge below indicated, is there any reason to suppose that if a direct action were permitted, it would not admit of a qualified immunity (which would be dispositive here because the legal theory sued on could not be called "established") or of the doctrine limiting money recoveries against public officials to cases of actual participation.

3. *Regulations.* Could the regulations dealing with transfers and related procedures be fairly read as in themselves establishing a rule of personal liability of officials in case of breach? It is implausible to imagine that the Legislature, in granting the department authority to promulgate regulations, see G. L. c. 124, § 1; G. L. c. 127, §§ 20, 97, was empowering the department to create possible civil liability against the officials; implausible, too, to imagine that the writers of the departmental regulations were conscious of exercising

any such delegated power. Assuming an implicit delegation, where is the evidence that the writers "intended" to establish a personal liability? Cf. *Dinsky* v. *Framingham*, 386 Mass. 801, 804-810 (1982).[12] Especially in the face of the doctrine already noted, which limits personal liability of officials, we should not readily raise a liability by implication from regulations that say nothing about it.

B. *Other transfers*. The transfers of Martino in the period 1980-1983 other than to Rhode Island and the Walpole D.S.U. were to segregation units which were not the subjects of explicit regulations that could create liberty interests protective of inmates. Thus § 1983 could not apply. The case of *Longval* v. *Commissioner of Correction*, 404 Mass. 325, decided in 1989, suggested that where the conditions in a segregation unit, however named by the correction officials, were as severe as those at the D.S.U, the unit should be dealt with, at least for such purposes as requirements of hearings and so forth, as a D.S.U. The plaintiff offered by affidavit descriptions of conditions at segregation units which were contested by affidavits from prison personnel.[13] But if the *Longval* proposition applies and any segregation unit should be viewed as the equivalent of a D.S.U., then the analysis in part A above as to D.S.U. transfers becomes relevant and liability fails.

To conclude, our discussion has carried us far afield but the situations as of 1980 and 1983 were singular and decision is unlikely to have recurrent application. It is worth repeating (cf. note 10, *supra*) that, whatever might be the case as to money damages, equitable relief was available at all times against violation of regulations.

*Judgment affirmed.*

---

[12]The record contains an affidavit of Commissioner Hall who asserts that those who drafted the 1978 regulations had no such design. We disregard the affidavit as self-serving, even if remotely relevant.

[13]The judge below thought *Longval* should not be applied retroactively, but the point may be overlooked.