King, J.
This is an action for damages resulting from defendants’ unlawful strip search of plaintiff and in *242 terference with the plaintiffs visitation with Rodriguez Charles, a prisoner at MCI-Cedar Junction. The plaintiff asserts claims under 42 U.S.C. §1983,[2] the First and Fourth Amendments to the United States Constitution, Articles 1, 10 and 14 of Part 1 of the Declaration of Rights of the Massachusetts Constitution, G.L.c. 127, §§36 and 37, G.L.c. 214, §l(b) and 103 C.M.R. 483.00 et seq. The plaintiff also seeks declaratory relief pursuant to G.L.c. 231A. A jury-waived trial was held on January 15, 16 and 17, 1997. Based upon the stipulations[3] of the parties and the credible evidence introduced during the trial, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
The plaintiff, Edith Stephen (Ms. Stephen) is a resident of the Dorchester section of Boston, Massachusetts. She is a 39 year old, divorced, high school educated mother of five children.
At all times relevant to this action, defendants Frances MacKinnon and Melissa Flaherty were correction officers at MCI-Cedar Junction, defendant Thomas Borroni was the shift commander at MCI-Cedar Junction, and defendant Ronald Duval was the Superintendent at MCI-Cedar Junction.[4] The defendants are being sued individually and in their official capacities.
MCI-Cedar Junction is the only maximum security prison in the Commonwealth of Massachusetts. The smuggling of drugs into MCI-Cedar Junction by visitors is a major security problem at the institution. For this reason, steps are taken to prevent visitors from bringing contraband into the facility. See 103 C.M.R. 483 et seq. (governing visiting procedures and steps prison officials are obligated to take to prevent contraband from entering prisons). Visitors are required to fill out a visitor’s slip identifying themselves and indicating the relationship to the person they wish to visit. All visitors are required to undergo a pat search in the so-called pedestrian trap of the outer control building. Before the pat search, visitors are required to remove all of their personal belongings and to place those belongings in a locker. After going through the first trap, they go through a second trap, and from that trap into the visitors area. Visitors are only allowed to bring the locker key and some change for vending machines into the visiting area.
Rodriguez Charles is an inmate at MCI-Cedar Junction. During a September 1988 visit to MCI-Cedar Junction, a visitor transferred heroin to Mr. Charles who then secreted the heroin in his anal cavity. Mr. Charles was later arrested, indicted and, in October 1989, was convicted of possession of heroin with intent to distribute it. He received a five to ten year sentence from and after the sentence he was serving at the time of his conviction.
Ms. Stephen was introduced to Mr. Charles through his mother in November 1992 while he was in prison. Ms. Stephen had visited with Mr. Charles approximately forty-seven times during the three months prior to the June 18, 1993 incident at issue in this case.
During visits prior to the June 18, 1993 incident, Ms. Stephen repeatedly protested the security measures taken to prevent contraband from entering the prison. She felt that the pat searches were unnecessary and unduly intrusive. On May 20, 1993, she had an angry exchange with correction officer Eileen Parker when Officer Parker insisted on inspecting Ms. Stephen’s hair. On May 27, 1993, Ms. Stephen was asked to walk through a metal detector without her shoes on. Visitors are not allowed to go through the metal detector wearing their shoes because the nails in shoes may cause the metal detector to go off. After passing through the metal detector she became upset because she was not allowed to immediately put her shoes back on. On that day she also felt harassed when she was asked to re-write her visitor slip because the slip was not legible. On June 5, 1993, she was involved in another incident with a correction officer concerning the pat search procedures. It is fair to say that by June 18, 1993, Ms. Stephen was angry and upset concerning the security measures taken to prevent contraband from being introduced into the prison.
In the afternoon of June 18, 1993, Ms. Stephen arrived at MCI-Cedar Junction to visit Mr. Charles. She was wearing a jump suit, shoes and transparent nylon foot stockings, known as “peds,” on her feet.
Upon arriving at the visitors area, Ms. Stephen underwent the customary pat search at the first pedestrian trap. As part of the search, she had to remove her shoes and the bottom of her feet were inspected. As she passed through the second pedestrian trap of the inner secured portion of the prison and was walking towards the outdoor picnic table and bench, she was observed, at 3:45 p.m., by correction officer Smith (Smith). Smith, who was in the tower above the second pedestrian trap, saw Ms. Stephen remove something from her foot area and place it in her waist area or in her pocket. Smith informed officer William Kelley in the administrative control room of his observations. Thomas Borroni, the Shift Commander, authorized a second pat search of Ms. Stephen. Officer Kelley, in turn, told Sergeant Frances MacKinnon (Sgt. MacKinnon), the officer in charge of the visiting room.
Sgt. MacKinnon had worked at MCI-Cedar Junction since 1987, the last three years in charge of the visiting room. Based on her knowledge of Mr. Charles’ drug background and the suspicious conduct reported by correction officer Smith, Sgt. MacKinnon reasonably suspected that Ms. Stephen was attempting to smuggle contraband into the prison. For this reason, Sgt. MacKinnon then went to the visitor’s yard where she asked Ms. Stephen to accompany her. Ms. Stephen responded: “This is fucking ridiculous, why are you picking on me?” Sgt. MacKinnon explained to Ms. *243 Stephen that because she had been observed removing something from her feet and acting suspiciously, she wanted to check her for contraband. Ms. Stephen told Sgt. MacKinnon that she had removed peds from her feet and had placed them in her pocket, an explanation that Sgt. MacKinnon did not accept. Sgt. MacKinnon told her that if she wanted to visit Mr. Charles she would have to submit to a second pat search. Ms. Stephen became quite angry and agitated. Although she protested, she agreed to the second pat search and followed Sgt. MacKinnon to the ladies room.
In the ladies room, Sgt. MacKinnon followed standard procedures for the second pat search. When she reached Ms. Stephen’s crotch area, Ms. Stephen jumped back on three separate occasions and would not allow Sgt. MacKinnon to complete the pat search. This made Sgt. MacKinnon even more suspicious that Ms. Stephen had contraband hidden on her person. Although Ms. Stephen testified that the reason she backed off was because Sgt. MacKinnon was touching her body in an overly rough, painful, and inappropriate manner, the court did not find this testimony credible. While Sgt. MacKinnon was conducting the pat search, Sergeant Melissa Flaherty (Sgt. Flaherty) was standing nearby at the adjacent inner control room, to assist Sgt. MacKinnon if needed.
Based upon Ms. Stephen’s refusal to cooperate with the second pat search, Sgt. MacKinnon decided to conduct a strip search of Ms. Stephen. Sgt. MacKinnon opened the bathroom door and asked Sgt. Flaherty to call the shift commander for permission to do the strip search because Ms. Stephen was not cooperating. Sgt. Flaherty returned a short time later and said that approval had been given by Shift Commander Borroni for the strip search. Borroni had the authority to authorize the strip search. Sgt. MacKinnon told Ms. Stephen that she would have to undergo a strip search if she wanted to visit with Mr. Charles.[5] Ms. Stephen became quite upset and protested the need for the strip search but finally agreed when she was informed that she could be barred from the institution for up to one year if she refused to undergo the strip search. See 103 C.M.R. 483.16. She understood that she had the option to refuse to allow the search but knew she might not be allowed to visit Mr. Charles if she refused permission.
Ms. Stephen, Sgt. MacKinnon and Sgt. Flaherty then proceeded to the ladies’ lounge. As they were heading towards the women’s lounge, passing prison employees, inmates and other visitors, Ms. Stephen berated them and was verbally disruptive. Sgt. Flaherty asked her to please lower her voice. Ms. Stephen responded in a loud manner with “fuck you."
Two female officers must be present during a strip search. Consent to the search must be obtained in writing. A visitor has the right to leave the prison rather than submit to a strip search. The visitor may choose to leave at any time during the procedure rather than allow the search to continue. See 103 C.M.R. 483.14(1)(9). If a visitor refuses to submit to a strip search, the visitor runs the risk of being barred from visiting the prison for up to one year. See 103 C.M.R. 483.16(5)(d). On the way to the ladies lounge, Sgt. Flaherty stopped to pick up the consent log. To avoid the risk of being banned from visiting Mr. Charles, Ms. Stephen, at 3:55 p.m., signed the consent log and wrote “yes” under the column indicating that she consented to the strip search. At that point she voluntarily agreed to the strip search knowing that she had the right to refuse to do so. She had not been informed that she was required to submit to the strip search.
Ms. Stephen, Sgt. MacKinnon and Sgt. Flaherty then went into the bathroom next to the ladies’ lounge. They were the only three persons present. The testimony differed concerning what took place during the strip search. Ms. Stephen testified that she was intentionally humiliated and demeaned, that Sgt. MacKinnon touched her breasts, kicked her feet apart, forcing her to bend over, and pulled her buttocks apart to examine her vaginal and anal areas. Ms. Stephen also testified that she was initially stripped naked and searched by Sgt. MacKinnon alone and subsequently was searched again when Sgt. Flaherty joined them. Ms. Stephen testified that she asked to leave the prison three or four times, but that Sgt. MacKinnon refused to let her leave until the completion of the strip search. The court did not find much of Ms. Stephen’s testimony credible.
The court finds that the strip search itself was conducted pursuant to the prison’s normal policies. See 103 C.M.R. 483.14. Before the strip search began, Sgt. MacKinnon explained the procedures to Ms. Stephen. She showed Ms. Stephen how she wanted her to remove her clothes and how to bend over so she could visually examine her anal and vaginal areas.
There was no physical touching of Ms. Stephen by either Sgt. MacKinnon or Sgt. Flaherty. They acted professionally and courteously in their dealings with Ms. Stephen. Although Ms. Stephen was clearly upset and protested what was taking place, she voluntarily agreed to the strip search, removed her clothing and cooperated until she was asked to bend over for a visual examination of her anal and vaginal areas.
When Ms. Stephen was asked to bend over she said, “I’m not doing that. I want to leave.” See 103 C.M.R. 14(4) (the visitor may leave at any time during the strip search unless there are grounds to arrest the visitor). In substance, Ms. Stephen withdrew her permission to continue with the search. This request to terminate the search, however, made Sgt. MacKinnon even more suspicious that Ms. Stephen was concealing contraband. Sgt. MacKinnon then told Ms. Stephen that because she had already signed the consent form, she would have to remain until the search was completed. Sgt. MacKinnon then said, “This is all you have to do, *244 and then you can go.” Ms. Stephen responded “If I do it, can I see Charles?” Sgt. MacKinnon responded, “Yes, if nothing is found." She bent over, calling Sgt. MacKinnon a “white bitch,” and allowed Sgt. MacKinnon to examine the rest of her body. No contraband was found. Ms. Stephen was then allowed to get dressed. The portion of the search that took place after Ms. Stephen bent over probably took less than a minute.
Sgt. MacKinnon violated the visitor search regulations when she informed Ms. Stephen that she could not withdraw her permission to the strip search. Ms. Stephen’s subsequent consent allowing the search to be completed was not voluntary because she was informed that she did not have the right to terminate the search.
After leaving the women’s lounge, Ms. Stephen continued to complain loudly about how she had been treated. Ms. Stephen swore at the officers, threatened to sue their “asses” and again called Sgt. MacKinnon a “white bitch.” Based upon information furnished by Sgt. MacKinnon to Shift Commander Borroni concerning Ms. Stephen’s behavior, he decided to bar Ms. Stephen from the facility for the day. Sgt. MacKinnon then informed Ms. Stephen that she would not be allowed to see Mr. Charles that day. Ms. Stephen then went to Superintendent Duval’s office to complain about how she had been treated. He was not available so she left the prison and went home.
On June 19, 1993, Ms. Stephen returned to visit Mr. Charles. She was informed that Superintendent Duval was considering whether to bar her from the institution and that she could not visit Mr. Charles in the meantime. A few days later, Superintendent Duval sent Ms. Stephen written notification that her visiting privileges had been suspended for a year as a result of disruptive conduct and disrespect to staff and disregard for rules and regulations during her visits to the prison. Ms. Stephen appealed defendant Duval’s decision but her appeal was denied. Eventually, her visiting rights were reinstated on June 29, 1994. However, Ms. Stephen has chosen not to return to the prison.
RULINGS OF LAW
Ms. Stephen claims a violation of 42 U.S.C. §1983 on the grounds that the search conducted on June 18, 1993, violated her rights under the United States and Massachusetts Constitutions to be free from unreasonable searches. She also claims the search violated her privacy rights under G.L.c. 214, §9(b) and 103 C.M.R. 483 because there was no reasonable suspicion for the search. Ms. Stephen also claims that the subsequent decision to suspend her visiting privileges for one year violated her visitation rights under G.L.c. 127, §§36 and 37 and her association rights under the United States and Massachusetts Constitutions.
I. Legality of Strip Search
Strip searches of prison visitors are not unlawful per se. The procedure is permitted if it is done in a reasonable manner; that is, the search must have been justified at its inception, and the intrusion at each further stage of the search must be justified. New Jersey v. T.L.O., 469 U.S. 325 (1985). The constitutionality of strip searches of prison visitors is governed by the standard of “reasonable suspicion.” See Wood v. Clemons, 89 F.3d 922, 929 (1st Cir. 1996), Blackburn v. Snow, 771 F.2d 556, 564-66 (1st Cir. 1985).
Here, Correction Officer Smith’s observations from the control tower created the reasonable suspicion necessary to justify the initial decision to ask Ms. Stephen to return to the ladies’ room to submit to a further pat search.[6] Moreover, that observation, coupled with Mr. Charles’ drug background and Ms. Stephen’s suspicious conduct during the second pat search, namely, pulling away when Sgt. MacKinnon attempted to search her crotch area, created reasonable suspicion that Ms. Stephen had contraband on her person. Up until this point, none of the defendants violated Ms. Stephen’s rights. The next issue before the court is whether the search was reasonable after Ms. Stephen withdrew her consent to the search.
When Ms. Stephen refused to proceed any further there was no justification for continuing the search. Although Sgt. MacKinnon’s suspicion was heightened when Ms. Stephen asked to terminate the search, her suspicions did not, however, rise to the level of probable cause to arrest. Ms. Stephen was suspected of placing contraband in her pocket or elsewhere in her clothing. However, a search of her clothing revealed no contraband. The decision to proceed with the search was based on Sgt. MacKinnon and Sgt. Flaherty’s good faith but mistaken belief that they had the right to complete the strip search because Ms. Stephen had agreed in writing to be strip searched. Under the applicable regulation, which they obviously were not familiar with or did not understand, they had no such right. 103 C.M.R. 483.14(4)(b). After Ms. Stephen withdrew her consent, Sgt. MacKinnon and Sgt. Flaherty were not justified in detaining Ms. Stephen and continuing the search. Ms. Stephen’s subsequent acquiescence to the completion of the search does not constitute valid consent to the search because it was not freely given. The portion of the search which occurred after Ms. Stephen expressed her wish to leave was, therefore, unreasonable and in violation of Ms. Stephen’s constitutional right to be free of an unreasonable search. The court now turns to the question whether Ms. Stephen can recover damages against Sgt. MacKinnon and Sgt. Flaherty for this violation of her rights.[7]
Defendants argue that even if the search was unreasonable, they are immune from suit under 42 U.S.C. §1983 based upon the doctrine of qualified immunity. Government officials performing discre *245 tionary functions are entitled to qualified immunity from suit under 42 U.S.C. §1983 if their conduct did not “violate clearly established statutory or constitutional rights of which a reasonable [official] would have known.” Hegarty v. Somerset County, 53 F.3d 1367, 1372 (1st Cir. 1995), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See also Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994) (plaintiff must show that a defendant “violated the plaintiffs federally protected rights”). An official’s ability to prevail on a qualified immuniiy defense depends on the “objective reasonableness of [the official’s] conduct as measured by reference to clearly established law.” Davis v. Scherer, 468 U.S. 183, 191 (1984), quoting Harlow, 457 U.S. at 818.
In order for qualified immunity to apply, it must be shown that (1) the defendant was performing a “discretionary” function, and (2) that the defendant did not know, nor should she have known, that the conduct at issue violated a clearly established right. See Foster v. McGrail, 844 F.Supp. 16, 23 (D.Mass. 1994). Here, the actions of Sgt. MacKinnon and Sgt. Flaherty fail both prongs of the qualified immunity test.
A government officer is performing a discretionary function if the officer’s action is based on a policy or planning judgment. Harry Stoller & Co., 412 Mass. 139, 146 (1992) (examining discretionary function in the context of the analogous Massachusetts Tort Claims Act). Here, neither Sgt. MacKinnon nor Sgt. Flaherty’s actions in refusing to terminate the strip search involved policy or planning judgments. The policy and planning judgments were made by the Department of Correction when it adopted its visitor search regulations. 103 C.M.R. 483.14. These regulations specifically required Sgt. MacKinnon and Sgt. Flaherty to terminate the search on request unless they had probable cause to arrest. 103 C.M.R. 483.14(4)(b) (the visitor “may leave at any time during the strip search”). Under the facts found by the court, the defendants did not have the discretion to continue with the strip search.
Sgt. MacKinnon and Sgt. Flaherty argue that they should not be held liable under 42 U.S.C., §1983 because a violation of a regulation, without more, is not sufficient to warrant an award of monetary damages, citing Martino v. Hogan, 37 Mass.App.Ct. 710, 720-721 rev. denied, 419 Mass. 1106 (1994). Here, Sgt. MacKinnon and Sgt. Flaherty did not merely violate Ms. Stephen’s rights under the visitor search regulation. Rather, Ms. Stephen’s right to be free from an unreasonable search secured by the Federal and State Constitutions was violated.
The court now turns to the question of damages. The plaintiff has the burden to prove her damages by a preponderance of the evidence. The plaintiff experienced emotional distress, consisting of embarrassment and humiliation, beginning with the initial request by Sgt. MacKinnon that she submit to a second pat search. That emotional distress continued through the entire time that she remained at MCI-Cedar Junction on June 18, 1993. Ms. Stephen, however, is not entitled to be compensated for the emotional distress she sustained up until the point that she exercised her right to terminate the strip search. Prior to that time, she had agreed to be searched and her rights were not violated. The court finds that reasonable compensation for Ms. Stephen’s damages sustained after she withdrew her consent to be searched is $2,500. The court will hold a separate hearing on Ms. Stephen’s request for an award of reasonable attorneys fees.
In addition to the plaintiffs claim for damages under 42 U.S.C. §1983, Ms. Stephen relies on a number of other theories of recovery, including the Constitution of the Commonwealth of Massachusetts and the Massachusetts Privacy Act, G.L.c. 214, §1(b). While the facts support an award of damages under these other theories as well, Ms. Stephen is not entitled to recover cumulative damages. Under these circumstances, the court will dismiss her remaining causes of action arising out of the strip search as being duplicative.
II. Suspension of Visiting Privileges
Ms. Stephen seeks to recover damages from each of the defendants because of Superintendent Duval’s decision to suspend her visiting privileges for one year. Ms. Stephen’s right to visit Mr. Charles is protected by the right of association secured by the First Amendment to the United States Constitution and by G.L.c. 127, §§36 and 37, as well as 103 C.M.R. 483. At the conclusion of Ms. Stephen’s case, the court granted defendant Duval’s motion to dismiss pursuant to Mass.R.Civ.P. 41(b)(2). Even if Ms. Stephen’s association rights had been violated, the court ruled that Ms. Stephen was not entitled to recover damages against Superintendent Duval personally because his conduct was protected by qualified immunity. As previously noted, a government official performing discretionary functions is entitled to qualified immunity from suit under 42 U.S.C. §1983 if his conduct did not “violate clearly established statutory or constitutional rights of which a reasonable official would have known.” Heggarty v. Somerset County, supra. Based upon the information available to him, Superintendent Duval clearly did not know, nor should he have known, that his conduct in suspending Ms. Stephen’s visitation privileges violated a clearly established right.
As to the remaining defendants, Ms. Stephen has not established that she is entitled to any damages against them because none of those defendants made the decision to suspend her. They merely reported to Superintendent Duval the plaintiffs conduct on June 18, 1993. The reports which Superintendent Duval presumably relied on fairly accurately state what transpired. Moreover, Superintendent Duval’s decision was not based entirely on Ms. Stephen’s conduct on *246 June 18, 1993. Under these circumstances, judgment will enter in favor of the defendants with respect to Ms. Stephen’s claim arising out of her one year loss of visitation privileges.
Accordingly, the court enters the following order:
Within 21 days of the date of this order, the plaintiff shall serve on counsel for the defendants a motion for an award of attorney’s fees in conformity with the requirements of Superior Court Rule 9A. The plaintiff shall also serve a proposed form of judgment. After the court has received the 9A motion package, the motion will be scheduled for a hearing. Thereafter, a judgment will enter in accordance with the above findings.

 The defendants are each sued individually and in their official capacities. A suit against a state official in her official capacity is, in substance, a suit against the state. Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st. Cir. 1993). The state cannot be sued for retrospective relief, such as money damages, under 42 U.S.C. §1983 because the state is not a “person” under that statute. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 70 (1989).

 Exhibits 23 and 24 were filed by the parties as proposed findings of fact. At the direction of the court each side took the other side’s proposed findings and highlighted, in some instances with qualifications noted, the facts which are uncontested. Thus, exhibits 23 and 24 now constitute stipulations of fact.

 At the conclusion of the plaintiffs case, the court granted Ronald Duval’s motion to dismiss pursuant to Mass.R.Civ.P. 41(b)(2).

 According to the log that is kept (Ex. 9), there were three strip searches at MCI-Cedar Junction between April 14, 1993 and August 21, 1993.

 Ms. Stephen contends that the action Officer Smith observed was her removing her peds and placing them in her pocket. The court found this testimony credible. Given the heightened security necessary in the prison context, the court, however, finds that Officer Smith’s suspicions were reasonable based on his observations.

 There is no evidence that any of the other defendants violated the plaintiffs rights insofar as the strip search is concerned.