COMMONWEALTH *vs.* ELM MEDICAL LABORATORIES, INC.,
& others.[1]

No. 90-P-1378.

Suffolk. April 16, 1992. - July 24, 1992.

Present: KASS, JACOBS, & GILLERMAN, JJ.

*Department of Public Health. Attorney General. Civil Rights*, Availability
of remedy. *Governmental Immunity. Commonwealth*, Liability for tort.
*Statute*, Construction. *Massachusetts Tort Claims Act. Practice, Civil*,
Instructions to jury. *Injunction. Words*, "Person."

The Legislature's enactment of the State Civil Rights Act, G. L. c. 12,
§§ 11H & 11I, did not constitute a waiver of the Commonwealth's sov-
ereign immunity with respect to the acts described in § 11H. [74-80]
On appeal from the judgment in a civil action, this court declined to con-
sider arguments that had not been made in the trial court. [80-81, 83]
At the trial of a claim brought by the Attorney General under G. L. c.
93A, the Consumer Protection Act, the judge adequately instructed the
jury on the issue whether a given business practice is unfair or decep-
tive. [82-83]
In a proceeding brought by the Attorney General under G. L. c. 93A, the
Consumer Protection Act, it was proper for the judge permanently to
enjoin the individual defendants from maintaining a clinical laboratory;
however, they were entitled to be heard in new proceedings on the mat-
ter of termination or modification of the permanent injunction. [83-84]

CIVIL ACTION commenced in the Superior Court Depart-
ment on May 9, 1980.

The case was tried before *Herbert Abrams*, J.

*W. Paul Needham* for the defendants.

[1]Atilio Baez-Giangreco (Baez) and Joan Attianese. Baez was the
medical director and part-owner of ELM; Attianese was a part-owner of
and a supervisor at ELM. Attianese was joined as a defendant after the
commencement of the action. In addition, ELM, Baez, and Attianese filed
a cross-claim against the Department of Public Health, Nancy Ridley, and
Alfred L. Frechette.

*Susan Papanek McHugh*, Assistant Attorney General, for the Commonwealth.

GILLERMAN, J. In October, 1979, Nancy Ridley, the director of the laboratory regulation program at the Massachusetts Department of Public Health (DPH), inspected the facilities of ELM Medical Laboratories, Inc. (ELM).[2] The business of ELM was to perform laboratory tests in anatomic and clinical pathology, including tests in Pap smears.[3]

The results of the inspection were not satisfactory to Ridley. Additional information was gathered, in consequence of which the Attorney General on May 9, 1980, filed a complaint against ELM and Baez (see note 1, *supra*) alleging that ELM's medical testing procedures, and other acts and omissions, constituted unfair or deceptive acts or practices in violation of G. L. c. 93A, § 2. A preliminary injunction was sought and obtained, the effect of which was to shut down the Pap smear testing procedures of ELM. ELM, Baez, and Attianese filed a cross-claim against DPH, Ridley, and Alfred L. Frechette, Commissioner of Public Health, alleging tortious conduct and asserting Federal and State civil rights violations.

The Commonwealth's complaint and the cross-claim were tried to a jury in June and July of 1986, more than six years after the complaint was filed. The judge directed a verdict for DPH on the cross-claim against it, and he submitted special questions to the jury on the Commonwealth's c. 93A claims and on the surviving cross-claims against Frechette and Ridley. The jury found that ELM, Baez, and Attianese had each violated G. L. c. 93A, and they found for Ridley and Frechette on the cross-claims. Motions for a new trial

---

[2]Because some of the testing done by ELM was reimbursed through the Federal Medicaid and Medicare programs, the Federal Health Care Financing Administration (HCFA) required periodic inspections to assure compliance with its testing standards. HCFA contracted with DPH to perform the federally required laboratory inspections, applying HCFA standards.

[3]Pap smear screening involves the microscopic analysis of cells taken from a woman's cervix, which are stained, covered with a cover slip, and viewed under a microscope to determine the existence of any abnormal or potentially cancerous cells.

were denied, and judgment was entered imposing civil fines against Baez and Attianese and a permanent injunction barring them from participating in the management of a clinical laboratory.

On appeal ELM, Baez, and Attianese claim that there were erroneous instructions to the jury, that the directed verdict in favor of DPH was error, and that the judge abused his discretion in imposing civil fines and a permanent injunction.[4] We affirm the judgment.

First we recapitulate some needed background facts which, on the considerable documentary and testimonial evidence, the jury would have been warranted in finding.

Following the October, 1979, inspection referred to above, Ridley conducted a more extensive review of ELM's records. The review revealed, inter alia, that with only two cytologists ELM was performing sixty thousand screenings per year. The recommended standard maximum number of screenings per cytologist per year was ten thousand to twelve thousand.

There was a follow-up, joint Federal-State, inspection on April 22, 1980. This revealed numerous unacceptable procedures.[5] The investigators concluded on May 2, 1980, that "the probability of misdiagnosis of cytology cases is extremely high for this laboratory . . . [and that] the labora-

---

[4]Additional arguments made by the defendants do not merit extended discussion, as noted *infra.*

[5]The statement of deficiencies continued for sixteen pages. Among the findings was that Dr. Lotfizadeh, the cytologist on duty during the inspection, and who was paid by the slide, was observed screening slides at the rate of one every thirty to forty seconds. The recommended rate is approximately five minutes per slide. Contrary to Federal requirements, Pap screening tests were being conducted at the home of one of the screeners. Other deficiencies in quality control included the failure regularly to change solutions used to stain the slides, failure to reexamine suspicious slides, and use of cover slips inadequate to cover the smears.

In June, 1980, investigators from the Federal Center for Disease Control completed the rescreening of 400 of the 2,400 Pap smear slides taken from ELM. They found that twelve of the 400 slides were abnormal or potentially malignant but that ELM had labeled only two of the twelve slides as potentially malignant. ELM had misdiagnosed the other ten slides as normal when they were abnormal or potentially malignant. All ten of the misdiagnosed slides had been screened by Lotfizadeh.

tory's cytology operation should be considered an imminent health hazard and cytologic diagnosis should cease."

Because much of ELM's work was not subject to Federal regulation, DPH contacted the Attorney General's office, and suit was brought on behalf of the Commonwealth.

Meanwhile ELM was informed by letter dated May 22, 1980, that, for all the reasons set out in the letter, HCFA (see note 2, *supra*) had terminated ELM's Federal certification for Pap smear testing effective June 7, 1980, that notice of the termination would be published in a local newspaper explaining the reasons for the action, and that the termination, and the reasons therefor, would also be made known to the users of ELM's services.

As a result of their findings, HCFA and DPH issued a "Health Alert" dated July 2, 1980, at a joint press conference held by the two agencies. The release published a list of physicians and clinics who referred Pap smears to ELM for testing during the preceding four years, and it included the warning that "[a]ny woman who has had a Pap smear taken by any of these physicians or clinics should contact them promptly to determine if rescreening is necessary. . . . [S]ome women could be at risk because their Pap smear slides were improperly screened or actually misread. . . . [W]e believe that at least several hundred women are not aware that they are at some unnecessary risk of having abnormal, pre-cancerous or cancerous condition." The release did not mention either Baez or Attianese.

1. *The directed verdict in favor of DPH on the cross-claim.* Count one of the cross-claim alleged negligence in conducting the inspections of ELM's laboratories and in releasing the "Health Alert." In count two it was alleged that the acts described in count one, and certain other acts, were all designed to intimidate and coerce Baez and Attianese and deprived them of their rights to due process, all in violation of 42 U.S.C. § 1983 (1988) and G. L. c. 12, §§ 11H and 11I.

We first address the primary issue in this case, the motion for a directed verdict against DPH in respect of count two —

claims arising out of the State Civil Rights Act.[6] The trial judge disagreed with the motion judge and ruled that the enactment of G. L. c. 12, §§ 11H and 11I, did not constitute a waiver of the State's sovereign immunity, and the Commonwealth defends the trial judge's decision in this court. Neither this court nor the Supreme Judicial Court has, to our knowledge, decided whether the State, or a department of the State, is a "person" for purposes of G. L. c. 12, §§ 11H and 11I.

The Commonwealth argues that much of the language of the State Civil Rights Act was borrowed directly from the Federal Civil Rights Act, and therefore Massachusetts courts should follow Federal decisions in deciding interpretive issues under the State act. The United States Supreme Court in *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 70 (1989), held that a State agency is not a "person" for purposes of § 1983 when suit is brought in a State court.[7]

---

[6]General Laws c. 12, § 11H, as inserted by St. 1979, c. 801, § 1, provides in pertinent part as follows: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."

General Laws c. 12, § 11I, as inserted by St. 1979, c. 801, § 1, provides as follows: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

[7]A § 1983 suit against a State in the Federal court is barred by the Eleventh Amendment to the Constitution of the United States unless the State has waived its immunity. See *Will* v. *Michigan Dept. of State Police*, 491 U.S. at 66.

Therefore, the argument goes, we should reach the same result under the State Civil Rights Act.[8]

The Supreme Judicial Court has relied on Federal decisions in concluding, in an action under the State Civil Rights Act, that a qualified immunity is available to public officials performing discretionary functions. See *Duarte* v. *Healy*, 405 Mass. 43, 46 (1989). But the court has not yet adopted all the decisions of the United States Supreme Court under § 1983, see *id*. at 47. More to the point, the decision of the United States Supreme Court in *Will* v. *Michigan Dept. of State Police, supra*, preserving the sovereign immunity of States and their agencies, was substantially influenced by considerations of federalism. See *id*. at 65 (if Congress intends to alter the "constitutional balance between the States and the Federal Government," it must do so by unmistakably clear language).

We must decide the question under our own jurisprudence. We conclude, for a number of reasons, that the Commonwealth is not a "person" for purposes of c. 12, §§ 11H and 11I.[9]

Neither the language of the statute nor its legislative history supports the argument that the Commonwealth is a "person." Certainly the use of the word "person" does not

---

[8]A closely-related issue is whether a city, in an action against it under the State civil rights act, may claim the protection of sovereign immunity. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 782 (1987), involving a claim against a town under the State Civil Rights Act. The court observed that the town made no claim to immunity, "and it may well be right in not making that claim." *Ibid*. The court cited *Owen* v. *Independence*, 445 U.S. 622, 650 (1980), a case against a city arising under § 1983 following the court's decision in *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978), which had held that a municipality was a person under § 1983. The United States Supreme Court in *Owen* held that the city was not entitled to a qualified immunity for their good faith constitutional violations. We express no opinion with regard to the immunity, if any, of municipalities to actions brought under the State Civil Rights Act. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. at 782 n.13; *Rodriques* v. *Furtado*, 410 Mass. 878, 889 n.14 (1991).

[9]We draw no distinction between suits against the Commonwealth and, as here, suits against a department of the Commonwealth.

call for that result, for that word is not ordinarily construed to include the State. See *Kilbane* v. *Secretary of Human Servs.*, 14 Mass. App. Ct. 286, 287-288 (1982), where the authorities are collected. See also *Will* v. *Michigan Dept. of State Police*, 491 U.S. at 64 ("in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it"). The definition of a "person" in G. L. c. 4, § 7, Twenty-third, includes such nonanimate entities as corporations, societies, associations, and partnerships but not the Commonwealth or its departments.

The statute's legislative history is not to the contrary. Reviewing that history, the Supreme Judicial Court in *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 821 (1985), observed that "[t]he Legislature passed this statute to respond to a need for civil rights protection under State law. Deprivations of secured rights by *private individuals* using violence or threats of violence were prevalent at the time . . . . The statute encompassed *private action* where otherwise 'State action' would be required" (emphasis added; footnote omitted).

More importantly, there is no reason to believe that the Legislature intended, by the enactment of G. L. c. 12, §§ 11H and 11I, to waive sovereign immunity. While the Act itself "admits of no immunities," *Chicopee Lions Club* v. *District Attorney for the Hampden Dist.*, 396 Mass. 244, 251-252 (1985), the Supreme Judicial Court has ruled that certain immunities are available under the act. See *id.* at 252. See also *Duarte* v. *Healy*, 405 Mass. at 48. The decisive inquiry in this case is whether the Legislature, in enacting the statute, "intended to abrogate a tradition of . . . [sovereign] immunity rooted in history and based upon sound considerations of public policy." *Chicopee Lions Club* v. *Dist. Attorney for the Hampden Dist.*, *supra* at 252.

There can be no doubt of the age and strength of the doctrine of sovereign immunity in this Commonwealth. In 1977, the Supreme Judicial Court observed, "Massachusetts is one of only five remaining States which retain the common law

[governmental] immunity at both the State and local levels."
*Whitney* v. *Worcester*, 373 Mass. 208, 212 (1977).[10] Where,
as here, the immunity issue arises in the context of statutory
interpretation, the Supreme Judicial Court, in 1973, quoting
from *Troy & Greenfield R.R.* v. *Commonwealth*, 127 Mass.
43, 46 (1869), said that "[i]t is a fundamental principle of
our jurisprudence, that the Commonwealth cannot be im-
pleaded in its own courts, except by its own consent clearly
manifested by act of the Legislature." See *Morash & Sons* v.
*Commonwealth*, 363 Mass. 612, 615 (1973) (Commonwealth
held to have waived its sovereign immunity in contract but
not in tort, notwithstanding the statutory provision that the
Superior Court "shall have jurisdiction of all claims at law or
in equity against the commonwealth"). See also *Murdock
Parlor Grate Co.* v. *Commonwealth*, 152 Mass. 28, 29
(1890) ("The Commonwealth can be sued in its own courts,
undoubtedly, where clear statutory authority for that purpose
has been given by the Legislature, but in view of its sover-
eignty the intent to confer such authority should be clearly
manifested").

This long-standing, judicially constructed principle of stat-
utory construction — requiring a clearly manifested legisla-
tive intent when immunity is to be waived — has been unaf-
fected by anything the court wrote in *Morash* ("sovereign
immunity is a judicially created common law concept," 363
Mass. at 615) or *Whitney* (making the argument for the ab-
rogation of governmental immunity in tort actions — see
note 10, *supra*), or by anything the Legislature did in enact-
ing the Massachusetts Tort Claims Act in 1978. In subse-
quent decisions, *Woodbridge* v. *Worcester State Hosp.*, 384
Mass. 38, 42 (1981), and *C & M Constr. Co.* v. *Common-
wealth*, 396 Mass. 390, 392 (1985), the court once again ob-
served that the "rules of construction governing statutory

---

[10]In *Whitney*, the court announced its intention to abrogate the doctrine
of governmental immunity from tort liability if the Legislature did not act
by the conclusion of its 1978 session. *Id.* at 210. Within one year of the
decision in *Whitney*, the Legislature enacted the Massachusetts Torts
Claims Act, St. 1978, c. 512.

waiver of sovereign immunity are stringent. . . . Consent to suit must be expressed by the terms of a statute, or appear by necessary implication from them." *Ibid.*

We recognize that the State Civil Rights Act, being remedial, "is entitled to liberal construction of its terms," *Batchelder* v. *Allied Stores Corp.*, 393 Mass. at 822; *Redgrave* v. *Boston Symphony Orchestra, Inc.* 399 Mass. 93, 99 (1987), but that rule of construction is not enough to overcome the absence of *any* manifestation of the intention of the Legislature to waive sovereign immunity in the enactment of the State Civil Rights Act. There is nothing in G. L. c. 12, §§ 11H or 11I, that even suggests that the Legislature intended a waiver of sovereign immunity.

Moreover, we must assume that when the Legislature enacted c. 12, §§ 11H and 11I, it was aware of the existence of G. L. c. 258, §§ 1-10, the Massachusetts Tort Claims Act, passed one year earlier. See *C & M Constr. Co.* v. *Commonwealth, supra* at 393. There the Legislature, in limiting governmental immunity from tort liability, did so in carefully measured terms.[11] "Given that adoption of the [State Civil Rights] Act followed closely on the heels of enactment of the Tort Claims Act, we think it both logical and likely that the Legislature viewed the later legislation in light of the earlier enactment . . . ." *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield*, 401 Mass. 26, 36 (1987). Thus, it is highly unlikely that the Legislature would discard the recently enacted and carefully arranged scheme of limited and conditional liability of the Commonwealth for tortious conduct which appears in c. 258 in favor of what the defendants now propose: the unlimited and unconditional liability of the

---

[11]Under the Tort Claims Act, there is no liability for punitive damages, and, subject to the indemnification provisions of §§ 9, 9A, and 13, liability is limited to $100,000 (§ 2); cases against the Commonwealth must be brought where the claimant resides or in Suffolk County (§ 3); there are detailed provisions with regard to the required presentment of claims (§ 4) and with regard to the option of public employers to choose the arbitration or compromise of any claim (§ 5); and, most important, there is an exclusion from the provisions of §§ 1-8 for a wide variety of intentional torts (§ 10[c]).

Commonwealth for violations of the State Civil Rights Act by means of threats, intimidation, or coercion. This is especially so given that c. 258, §§ 9 and 9A, already provided for the conditional indemnification by public employers for the violation of the "civil rights of any person" by public employees. See *Filippone* v. *Mayor of Newton*, 392 Mass. 622, 627 (1984).

There is a further difficulty with the position of the defendants. As to those intentional torts which may fall within the provisions of both G. L. c. 258, § 10(*c*),[12] and c. 12, § 11H, see *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield, supra* at 39 (Wilkins, J., concurring) ("Some violations of the Civil Rights Act . . . should be treated as intentional torts for the purposes of § 10(*c*) and others should not be"), § 10(*c*) would provide immunity to the State while § 11H would impose liability — a result presumably precluded by the exclusivity provision of c. 258, § 2 ("The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer . . ."). 

We conclude that the Legislature, by enacting the State Civil Rights Act, did not intend to bypass c. 258 and abolish sovereign immunity for the acts described in § 11H.

As to count one of the cross-claim, the record before us reveals that it was not an issue at the trial. The motion for a directed verdict in favor of DPH made no mention of count one. The argument in opposition to the allowance of the motion for a directed verdict in favor of DPH was confined to arguments based on G. L. c. 12, §§ 11H and 11I.[13] Indeed, at the argument on the motion, neither the judge nor any

---

[12]General Laws c. 258, § 10(*c*), as inserted by St. 1978, c. 512, § 15, provides: "The provisions of sections one to eight, inclusive, shall not apply to . . . any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations . . . ."

[13]The docket entries disclose that no written opposition to the motion for a directed verdict was filed.

attorney made any mention of the negligence claim described in count one. The judge, in his charge to the jury, referred only to the Commonwealth's claim under c. 93A and the cross-claim under the Civil Rights Act. He made no mention of any possible liability of Ridley and Frechette under count one. The special questions put to the jury were similarly limited to issues arising under c. 93A and the Civil Rights Act; there was no question relating to the possible liability for tortious conduct under count one. All this occurred without objection by any party to the omission of any reference to count one.[14]

In these circumstances we decline to discuss the arguments in this court in support of count one which reappear for the first time since the decision of the motion judge. The claims under count one having been abandoned in the trial court, they cannot be resurrected in this court. "The general rule is that an issue not raised in the trial court cannot be argued for the first time on appeal." *M.H. Gordon & Son, Inc.* v. *Alcoholic Bev. Control Commn.*, 386 Mass. 64, 67 (1982), citing *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 565 (1976); *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 88 (1977).

The judge correctly directed a verdict in favor of DPH on the cross-claim.[15]

---

[14]Early in the pretrial proceedings, DPH filed a motion to dismiss the cross-claim as against it. The motion judge denied the motion. He reasoned that, if ELM, Baez, and Attianese succeeded in establishing a violation of their rights to due process, they might be entitled to relief under the State Civil Rights Act. In his memorandum, the motion judge also wrote that the claims alleged in count one of the cross-claim were barred by the exceptions in the Massachusetts Tort Claims Act contained in G. L. c. 258, § 10(*b*) and 10(*c*). This latter point, not being necessary to the judge's decision, was obiter dictum, and, given the denial of the motion to dismiss, could provide no ground for an objection or a claim of appeal.

[15]Although no party has advanced an argument on the point, we note that the issue of sovereign immunity did not become moot upon findings by the jury in answer to special questions that Ridley and Frechette did not "violate the civil rights" of Baez and Attianese. The judge charged the jury that Ridley and Frechette were entitled to "a defense of good faith immunity," meaning that they "applied the law as they reasonably understood it." There was sufficient evidence to warrant the jury in finding that

2. *Jury instructions.* ELM, Baez, and Attianese objected to the following portion of the charge: "If you find that ELM should have told its customers of the deficiencies present in its lab because it would have made a difference in how those customers acted, or that such deficiencies were material and that ELM failed to notify customers about them, or that ELM promoted its service as being better and more efficient than in reality they were, then you would be warranted in finding that the defendants had violated the Consumer Protection Act."

The thrust of the objection was that the judge's instructions imposed a duty to disclose deficiencies whether or not the operators of the laboratory were aware of them. We evaluate the judge's charge as a whole, not by fragments. *Commonwealth* v. *Blake*, 409 Mass. 146, 151 (1991). *Cooper* v. *Richter*, 8 Mass. App. Ct. 878, 879 (1979). There was no error. The judge instructed the jury that it was their duty to decide any disputed questions of fact; that in order to prevail under c. 93A the Commonwealth had to prove by a fair preponderance of the evidence that the laboratory or its operators engaged in unfair or deceptive acts or practices, such as unethical or unscrupulous acts, or whether the practices caused substantial injury to customers; that deceptive acts or practices may consist of failure to disclose important information and misrepresentations; and that whether a given

---

Ridley and Frechette had sustained their "good faith immunity" as described by the judge. For recent decisions describing the qualified immunity of public officials in actions brought under the State Civil Rights Act, see *Duarte* v. *Healy*, 405 Mass. at 46-48, and *Rodriques* v. *Furtado*, 410 Mass. 878, 881-882 (1991). Because the qualified immunity of public officials is personal to the official, see *Rodriques* v. *Furtado, supra* at 882 (rationale for qualified immunity of public officials is, in part, the need to protect public officials from " 'insubstantial lawsuits' which may deter them from carrying out their official responsibilities"), even if established, it would not necessarily preclude the liability of the sovereign (in the absence of its immunity), if the jury were to find that Ridley and Frechette, with the protection of qualified immunity, violated the civil rights of Baez and Attianese by threats, intimidation, or coercion. See *Duarte* v. *Healy*, 405 Mass. at 48, quoting from *Davis* v. *Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who violate constitutional rights enjoy a qualified immunity that *protects them* . . .") (emphasis added).

business practice is unfair and deceptive must be determined from the circumstances of each case. The judge also instructed the jury that a deceptive act may occur in a number of different ways. For example, "if knowing about conditions which render ELM's diagnoses inaccurate would have caused a person requesting such a diagnosis to have doubts about using ELM's services, finding that ELM failed to disclose material information *which it could foresee* would be important to doctors or patients, diagnosing physical specimens like Pap smears in any way which had the capacity, tendency, or effect of misleading or deceiving its clients or prospective clients" (emphasis added). The emphasized language fully met the objection.

ELM, Baez, and Attianese also object to the charge on the ground that the judge assigned to the Attorney General authority to regulate clinics when such authority resides in DPH. This was not an objection made to the judge, and the argument is not available on appeal. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974); *Consentino* v. *Consentino*, 10 Mass. App. Ct. 892 (1980); *Laveck* v. *Pascoe Pizza, Inc.*, 29 Mass. App. Ct. 935, 938 (1990). In any event, the Attorney General was acting well within his authority. See *Commonwealth* v. *Mass. CRINC,* 392 Mass. 79, 88 (1984). See also *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 42 (1979).

3. *The permanent injunction.* On January 5, 1987, more than five years ago, the judge entered a permanent injunction enjoining Baez and Attianese "from participating in any way in the direction, management or supervision of any operations or personnel of any clinical laboratory, as defined by G. L. c. 111D, § 1." The injunction, without doubt, is designed to protect the public interest. In cases brought by the Attorney General under the Consumer Protection Act, that is the proper standard. See *Commonwealth* v. *Mass. CRINC,* 392 Mass. at 88-89.

In this case, however, DPH is charged with the regulatory responsibility of setting and maintaining standards for clinical laboratories. See G. L. c. 111D, §§ 2-12, as inserted by St. 1975, c. 881, § 1. A person maintaining a clinical

laboratory must obtain a license from DPH, and DPH is required to issue a license to an applicant "if it finds that the applicant is responsible and suitable to maintain a clinical laboratory and meets other valid requirements of the department" (§ 5). After notice and hearing, a license may be revoked for any of the reasons described in § 11, and the department may bring a complaint to enforce compliance with c. 111D (§ 12).

The record does not disclose the activities of Baez and Attianese since the entry of the permanent injunction more than five years ago. "[I]t is possible that the remedy of a permanent injunction may no longer be appropriate." *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 842 (1977). Given the substantial arsenal of weapons in the hands of DPH with which to protect the public interest, the continuance of the injunction may not be necessary to protect that interest. Thus, while we affirm the judgment, we note that Baez and Attianese may, in new proceedings, choose to be heard on the matter of the termination or modification of the permanent injunction. See *id.* at 843. Should that occur, the judge would be guided by the standards set out in *Commonwealth* v. *Mass. CRINC, supra* at 89.[16]

*Judgment affirmed.*

---

[16]Various other arguments are made on appeal, including claims based on the conduct of counsel and on the Commonwealth's alleged failure to produce documents, in consequence of which ELM, Baez, and Attianese say their motions for a new trial should have been allowed. The motions were denied. There was no abuse of discretion. See *Galvin* v. *Welsh Mfg. Co.*, 382 Mass. 340, 343 (1981). The judge was also well within his discretion is assessing the civil penalties, see *Commonwealth* v. *Fall River Motor Sales, Inc.* 409 Mass. 302, 310 (1991), and the assessment of the civil penalty was not an unlawful retroactive application of G. L. c. 93A, § 4. See *Commonwealth* v. *DeCotis*, 366 Mass. 234, 245 (1974).