Garsh, J.
The plaintiff, William H. Moore (“Moore”), brought this action against Paul J. McManus (“McManus”), in his individual capacity and as staff attorney for the Committee for Public Counsel Services (“CPCS”), CPCS, and the members of CPCS in their individual and official capacities. Moore claims that while McManus was his attorney, he also represented Moore’s co-defendants, who were cooperating with the government in its case against Moore. In his complaint, Moore asserts claims against all the defendants for malpractice and gross malpractice (Count I), willful and negligent misrepresentation (Count II), fraud, deceit, and unfair and deceptive trade practices in violation of G.L.c. 93A (Count III), a violation of the Massachusetts Civil Rights Act, G.L.c. 12, §111 (Count IV), and a violation of the federal Civil Rights Act, 42 U.S.C. §1983 (Count V). At the hearing on the cross-motions for summary judgment, the plaintiff dismissed certain claims and was given leave to amend others. Count II was limited to McManus;[3] the G.L.c. 93A claim in Count III was dismissed, and the remainder of that count was limited to McManus in his individual capacity; the Massachusetts Civil Rights Act claim (Count IV) was dismissed, and that count was amended to state a cause of action for a direct violation of the Declaration of Rights in the Massachusetts Constitution.
This matter is before the court on the defendants’ motion for summary judgment and plaintiffs cross-motion for summary judgment. For the following reasons, the defendants’ motion is DENIED in part and ALLOWED in part. Plaintiffs cross-motion for summary judgment is DENIED.
BACKGROUND
The facts, viewed in the light most favorable to Moore, are as follows:
On December 10, 1991, Kevin Ryan (“Ryan”) reported a possible breaking and entering to the Blackstone Police Department. Ryan told police that goods had been loaded into a white Chevrolet Caprice with a female at the wheel, a male passenger in the front seat, *264 and another man in the back seat. As Ryan followed the vehicle, the passenger in the right front seat reportedly fired several shots at Ryan. Ryan provided the police with the registration number of the vehicle.
Upon investigation, the police discovered that a car with that registration number belonged to Susan Dumas (“Dumas”). At the Dumas residence, the police observed a white Chevy Caprice with no registration plates. On December 12, 1991, Dumas was arrested on several charges in connection with the Blackstone break-in. She informed police that she wished to cooperate and advised that Doreen Arseneau (“Arseneau”) may have been using her car at the time of the incident. Dumas also told police that she had overheard Moore, Mark Atteridge (“Atteridge”), later identified as the front seat passenger who shot at Ryan, and two other men discussing how they had “hit” a restaurant in Northbridge, Massachusetts and stolen money while holding employees at gun-point. According to Dumas, Arseneau was the “get away” driver in that incident.
In addition to her December 12, 1991 statement implicating Moore in at least one crime, Dumas gave police permission to search the cellar area of the residence which she and Moore shared. As a result of the search, police found weapons, two-way radios, scanner parts, and the license plate missing from the white Chevrolet. Dumas also consented to a search of her bedroom where police found jewelry and other items taken during the Blackstone break-in.
When Dumas was arraigned at Uxbridge District Court on December 13, 1991, CPCS was appointed to represent her, and McManus, a CPCS staff attorney, was assigned as her counsel.[4] At a pretrial hearing on January 14, 1992, he informed the court that he had a conflict of interest representing Dumas because he also represented Arseneau, a potential co-defendant. Sometime thereafter Dumas hired private counsel to represent her. McManus cannot say whether he read Dumas’ statement to the police implicating Moore, but an inference may be drawn that he had read the statement prior to Moore’s arraignment.
The day after her arraignment, Dumas helped police locate Arseneau. Arseneau was arrested on December 14, 1991, and, according to the application for a complaint against her, she admitted to having been the driver of the vehicle during the restaurant robbery. Arseneau told police that Atteridge, Moore, and another entered the restaurant with masks and guns and robbed the establishment. Arseneau was charged with armed robbery and arraigned on December 16, 1991. On that date, the court appointed CPCS to represent Arseneau, and McManus was assigned as her attorney.
On December 16, 1991, based on Arseneau’s statements, police applied for a complaint against Moore. Attached to that application was a lengthy police report which clearly linked Moore, Arseneau, Atteridge, and another as joint participants in several crimes. Dumas’ statement implicating Moore and Arseneau’s statement providing police with information on several crimes were also included in the application for a complaint.
On December 17, 1991, Arseneau pointed out a residence to the police where she said Moore might be staying. She also told police that they would likely find guns and an army-style camouflage duffel bag in Moore’s possession which had been used for a jewelry store robbery and the restaurant robbery. The affidavit in support of the search warrant for that residence indicates that the police received information concerning the restaurant robbery from Arseneau, who implicated Moore as one of the men who robbed the restaurant at gun point. According to the application for a search warrant, Arseneau also told police where they could find the weapons and other evidence linked to that robbery.
On the evening of December 17, 1991, Arseneau assisted the police in drawing Moore out of the dwelling. When Moore exited, he was arrested. A search of the residence uncovered weapons and a duffel bag. While in custody, Moore indicated that he wanted to cooperate with the police, but he felt that he needed to speak with an attorney first.
On December 18, 1991, Moore was arraigned at Uxbridge District Court, and McManus, who at this time was representing both Dumas and Arseneau, was assigned as his counsel.[5] Moore states that he told McManus on the date of his arraignment that he wanted to cooperate with the police. In his deposition, McManus conceded that he received and saw the complaint against Arseneau when he first began to represent her in Uxbridge District Court and may or may not have seen the application for the complaint and the police report which indicated that Moore was involved in crimes with her. An inference may be drawn that McManus was aware of the extent of Arseneau’s cooperation with the police before January 7, 1992. Although McManus states that he does not now recall when he found out that Arseneau had implicated Moore, based on his November 8, 1994 letter to Moore, Moore’s statements concerning the content of his conversations with McManus, Arseneau’s release on personal recognizance despite the seriousness of the charges, and the contents of the CPCS files, it may be inferred that McManus knew, prior to January 7, 1992, that Arseneau had cooperated with the police and had implicated Moore.[6]
On December 24, 1991 and January 7, 1992, Mc-Manus spoke with Moore. After the arraignment on December 18, 1991, Moore waived Superior Court review of his ball and, on two occasions, waived his right to a speedy return date based on advice from McManus. His case was continued twice until a pretrial conference was set for January 28, 1992.
*265 On January 14, 1992, McManus appeared on behalf of Dumas and Arseneau in Uxbridge District Court. McManus indicated that he had been told by Dumas that he was representing a co-defendant and it was conceivable that Arseneau was involved in the same events for which Dumas was charged. He advised the judge that Dumas should be given another attorney. The assistant district attorney (“ADA”) then informed the court, in the presence of McManus, that McManus may also have a conflict representing two other co-defendants,[7] including Moore, who was scheduled for a pre-trial conference on the 28th of January. When the judge indicated that he would schedule Arseneau for a conference on the same date as Moore, the ADA asked for another date; McManus added, “Actually, we’re looking for a date sort of farther down the road, your honor, and the third week in February if that would be possible.” When the judge inquired why, the ADA represented that Arseneau “presents a different set of circumstances.” McManus did not disagree.
An inference may be drawn from McManus’ request that Arseneau’s conference be scheduled on a different date from that scheduled for Moore, Atteridge, and another co-defendant, and from McManus’ silence when the ADA mentioned that Arseneau’s situation was different, that McManus knew enough about what Arseneau had told the police to rebut his deposition testimony that he knew virtually nothing about the facts of Arseneau’s or Moore’s case as of January 14, 1992. Similarly, an inference can be drawn from the January 14, 1992 hearing that rebuts McManus’ testimony that he was oblivious of any conflict before Arseneau testified at the grand jury.
Indeed, in a letter written by McManus to Moore on November 8, 1994, McManus states, “On the 7th of January, I made it clear to you that I could not appear on your case, not only because I was leaving the office, but also because of the conflict of interest between your defense and Ms. Arseneault’s (sic).” If McManus, in fact, told Moore on January 7, 1992, that a conflict existed, he knew more than he currently professes to have known.[8]
On January 16, 1992, Arseneau testified before the grand jury and implicated Moore. It was not until January 21, 1992, that McManus wrote a letter to the Uxbridge District Court with an attached motion to withdraw signed by a different CPCS attorney. In that letter, McManus advised the clerk magistrate that Moore’s case was set for a status conference on January 28, 1992 and that he was moving to withdraw as Moore’s counsel. McManus further stated that he was sure his motion would be granted because “these two [Moore and Arseneau] may testify against each other."
Neither McManus nor any other CPCS attorney sought the bail review or probable cause hearing which Moore claims McManus promised him. Moore states that he was not informed that a motion to withdraw as counsel had been filed by Moore and CPCS claiming a conflict of interest. The motion to withdraw was allowed effective February 4, 1992. Sometime later Moore retained private counsel for the initial charges as well as for subsequent charges related to the armed robbery of a jewelry store. Arseneau, who was represented by a CPCS attorney, testified against Moore at trial. Moore alleges that neither McManus nor any other CPCS attorney informed Moore of the conflict of interest or that Arseneau had testified against him at the grand jury. Moore claims that it was not until Moore’s private counsel received the grand jury minutes that he learned of the conflict of interest.
Of Moore’s co-defendants, one was acquitted of all charges. Atteridge was acquitted of some of the charges, and Arseneau received a five to six year suspended sentence and four years probation for her participation in the crimes. Moore received a total of thirty-three to fifty-one years, a life sentence from and after, and a second life sentence from and after.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the moving part is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Because the burden is on the movant in a motion for summary judgment, the evidence presented is construed in favor of the party opposing the motion, and the opposing party is given the benefit of all favorable inferences that can be drawn from that evidence. Parent v. Stone & Webster Engineering Corp., 408 Mass. 108, 112-13 (1990).
A party moving for summary judgment who does not bear the burden of proof at trial can demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unable to submit proof of the element at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
I. Massachusetts Tort Claims Act
The Massachusetts Tort Claims Act (“MTCA”), G.L.c. 258, §2, states in pertinent part, as follows: *266 The MTCA is the exclusive remedy for tort claims against public employers. See Fearon v. Commonwealth, 394 Mass. 50, 53 (1985).[9]
*265 Public employers shall be liable for injury . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances.
*266 The corollary of imposing liability upon public employers for tort claims is that public employees are immune from liability for an injury caused by negligent or wrongful acts or omissions committed within the scope of employment. G.L.c. 258, §2. This immunity extends to acts that may be grossly negligent. Monahan v. Methuen, 408 Mass. 381, 392 (1990); McNamara v. Honeyman, 406 Mass. 43, 46 (1989). A public employee is not, however, immune from liability for intentional torts. G.L.c. 258, §10(c). See McNamara, 406 Mass. at 46. Intentional tort claims against public employers, on the other hand, are barred by G.L.c. 258, §10(c). Spring v. Geriatric Authority, 394 Mass. 274, 282 (1985).
A. CPCS and all Individual Defendants Sued in their Official Capacity
1. The Status of CPCS as a Public Employer
The term “public employer” includes “any department, office, commission, committee, council, board, division, bureau, institution, agency or authority" of the Commonwealth “which exercises direction and control over” public employees. G.L.c. 258, §1. CPCS falls within that definition. It is a committee created by G.L.c. 21 ID to plan and coordinate the delivery of public counsel services for the purpose of representing indigent defendants. G.L.c. 21 ID, §1. CPCS consists of fifteen members appointed by the Supreme Judicial Court for a period of three years; they employ and oversee both salaried public counsel employed by CPCS and private counsel appointed on a per case basis to represent indigent defendants. Id. CPCS’s chief counsel and staff attorneys are paid by the state. G.L.c. 21 ID, §13. The Supreme Judicial Court has described CPCS as “a statutory agency of the Commonwealth.” German v. Commonwealth, 410 Mass. 445, 447 (1991). See also Machado v. Weld, 2 Mass. L. Rptr. No. 6, 112 (June 13, 1994) (“CPCS is a governmental entity related to the judiciary”), aff'd sub nom Machado v. Committee for Public Counsel Services, 39 Mass.App.Ct. 178 (1995).
Moore argues that because the judicial department is not encompassed by the term “agency” for the purposes of G.L.c. 30A, it must also be excluded from the MTCA. See In re Mead, 372 Mass. 253, 255 (1977) (board of bar examiners, as arm of judiciary, not subject to the requirements of G.L.c. 30A). Chapter 30A, however, explicitly excludes the judiciary or an arm of the judiciary from the definition of “agency.” G.L.c. 30A, §1. The MTCA, by contrast, does not exclude the judicial branch from the definition of “public employer.” G.L.c. 258, §1.
Moore’s argument that CPCS is a body politic and, therefore, not subject to the provisions of the MTCA is similarly without merit. CPCS is dissimilar from those entities specifically exempted in G.L.c. 258, §1 from the provisions of the MTCA. Nor can CPCS be characterized as an “independent body politic.” Unlike entities which are independent bodies, CPCS’s enabling statute does not give it independent body politic status, and CPCS is financially dependent on the Commonwealth. It lacks an “existence apart from and distinct from the Commonwealth." McNamara, 406 Mass. at 47, quoting Opinion of the Justices, 334 Mass. 721, 734 (1956). See also Kargman v. Boston Water and Sewer Commission, 18 Mass.App.Ct. 51, 56-59 (1984), CPCS does not exist as an independent financial or political corporate body, but rather, is a public employer subject to the provisions of the MTCA.
2. Presentment
Pursuant to G.L.c. 258, §4, a civil action shall not be instituted against a public employer, such as CPCS, unless a claimant first presents his claim in writing to the “executive officer” of such public employer or to the attorney general within two years after the date upon which the cause of action arose. G.L.c. 258, §4. The phrase “executive officer of a public employer” of the Commonwealth means ”... in the case of an agency not within the executive office, the attorney general, . . . and ... in the case of any other public employer, the nominal chief executive officer or board.” G.L.c. 258, §1.
Presentment is a statutory prerequisite to recovery under the MTCA. G&B Associates, Inc. v. Springfield, 39 Mass.App.Ct. 51, 54 (1995). Noncompliance with the presentment requirement of Section 4 entitles a public employer, which is a defendant, to summary judgment. See Baptiste v. Sheriff of Bristol County, 35 Mass.App.Ct. 119, 126-27 (1993). Constructive notice is not sufficient to satisfy the presentment requirement. Robinson v. Commonwealth, 32 Mass.App.Ct. 6, 10 (1992). Additionally, a public employer is not required to show that it was prejudiced by the plaintiffs failure to strictly comply with the presentment requirements set forth in G.L.c. 258, §4. Weaver v. Commonwealth, 387 Mass. 43, 47-49 (1982).
In the instant case, on October 31, 1994, Moore sent letters which were substantively the same to McManus at the CPCS office in Worcester and to CPCS in Boston and Worcester. Each letter was denominated as a “M.G.L.chapter 93A Demand Letter for Unfair and Deceptive Acts and Practices in the Provision of Legal Services.” The letters were addressed as follows: “Paul McManus, Esq., Public Counsel Division, Committee for Public Counsel Services;” “Committee for Public Counsel Services” in Boston; and “Public Counsel Division, Worcester Office, Committee for Public Counsel Services.” Moore forwarded no letter addressed to any named member of the Committee, the chief counsel of CPCS, or the attorney general, and he did not provide any of these individuals with a copy or copies of the letters he did send.
If CPCS is an “agency” of the Commonwealth within the meaning of c. 258, §1, and it has been described *267 as “a statutory agency of the Commonwealth,” German, 410 Mass. at 447, then Moore was required to make presentment on the attorney general.[10] The attorney general is the “executive officer” of an “agency” of the Commonwealth that is not within the executive branch of government. G.L.c. 258, §1. CPCS is not within the executive branch. Moore did not make presentment upon the attorney general.
Moore fares no better if CPCS falls within the catch-all provision of c. 258, §1 for “any other public employer.” Under that provision, a plaintiff must make presentment on “the nominal chief executive officer or board.” CPCS does not have a governing board,[11] and its enabling statute denominates it as a committee and not a board. See G.L.c. 21 ID, §1. Therefore, if CPCS falls in the category of “any other public employer,” Moore was required to make presentment on the nominal chief executive officer.[12]
The chief counsel is the “nominal chief executive officer” of CPCS within the meaning of G.L.c. 258, §1. According to CPCS’s enabling statute, G.L.c. 21 ID, the “committee shall appoint a chief counsel, whose responsibilities and duties shall be defined by the committee and shall include, but not be limited to, the overall supervision of the workings of the various divisions of the committee.” G.L.c. 21 ID, §13. The chief counsel is paid a salary comparable to the salary paid to a district attorney. Id. Accordingly, if CPCS is not an “agency” within the meaning of c. 258, §1, such that presentment must be made upon the attorney general, then Moore was required to make presentment on the chief counsel in that individual’s capacity as CPCS’ “nominal chief executive officer.”
In sum, Moore failed to comply with the presentment requirement of the MTCA.[13] Accordingly, CPCS and all the defendants acting in their official capacity are entitled to dismissal of the malpractice and gross malpractice claims and the claim for negligent misrepresentation.[14]
B. Defendants Sued in Their Individual Capacity
1. McManus
Public employees are “elected or appointed, officers or employees of any public employer” whether their service is “full or part-time, temporary or permanent, compensated or uncompensated.” G.L.c. 258, §1. The mere fact that an entity is a public employer within the meaning of the MTCA does not automatically mean that all its employees are public employees. McNamara v. Honeyman, 406 Mass. at 48. Instead, to be a public employee within the meaning of the MTCA, an employee must be subject to the direction and control of the public employer. See Smith v. Steinberg, 395 Mass. 666, 669 (1985), citing Kelley v. Rossi, 395 Mass. 659, 663 (1985).
Attorneys, like physicians, possess a high level of skill and training; both must use independent judgment. Ordinarily, physicians are not servants subject to the direction and control of a public employer. Smith, 395 Mass. at 667. However, even a physician who exercises independent judgment “can still be deemed a servant where the principal controls the details of the physician’s activities.” McNamara, 406 Mass. at 48. The central question is whether CPCS had the right to exercise direction and control over the manner and means in which McManus represented Moore.
The instant record “fails to show indisputably” that McManus was subject to the direction and control of CPCS. Smith, 395 Mass. at 669. An attorney is not necessarily an employee simply because an organization pays his salary. In Smith, the defendant doctor had worked for and was paid by the University of Massachusetts group practice plan. Id. at 668. The trustees of the university had the power to adopt rules and regulations for the management and administration of that group practice, but not to control the daily activities of the member physicians. The court noted that the defendant doctor could control his hours of work, the place he worked, and which patients he would treat, and that he was free to practice medicine as he wished, subject only to his teaching obligations at the university. Id. at 669.
McManus is a staff attorney compensated by CPCS and assigned cases by CPCS. Pursuant to c. 21 ID, he was obligated to work full-time for CPCS and could not engage in the private practice of law. As an attorney, McManus has an ethical obligation to exercise his independent judgment in representing his clients. McManus himself testified that, despite the fact that CPCS assigned cases to him, he had the right to turn down cases in which he had a conflict and could exercise his professional judgment as an attorney. In addition, McManus stated that although CPCS had guidelines for the representation of clients, they were “just guidelines.” He also testified that, although supervision of new CPCS attorneys is “intensive,” more experienced attorneys like himself were not as closely supervised.
On this record there is a genuine issue of material fact as to whether, in his representation of Moore, McManus was subject to the direction and control of CPCS or was free to practice law as he wished. Thus, McManus is not entitled to summary judgment on the ground that he has immunity under the MTCA as to the malpractice and gross malpractice claims in Count I or the claim for negligent misrepresentation in Count II. Furthermore, whether or not McManus is a public employee, he has no immunity for the intentional torts alleged in Count III of the complaint.
The court also rejects McManus’ argument that Moore has failed to raise a genuine issue of material fact as to whether any wrong committed by McManus was the proximate cause of any damage to Moore. For purposes of this motion, it has been assumed that at *268 trial, an expert will testify for Moore that McManus’ actions did not comply with the standard of care of the average qualified attorney and, as a result, Moore was harmed.[15]
Moreover, although Moore may be required to prove his innocence in order to prevail on his malpractice claims, Glenn v. Aiken, 409 Mass. 699 (1991),[16] Moore is not collaterally estopped from proving his innocence by the fact of his conviction. Id at 703-04. The summary judgment record does not show an absence of any genuine issue of material fact on the plaintiffs claims against McManus. Accordingly, neither Moore nor McManus is entitled to summary judgment as to plaintiffs negligence and intentional tort claims.
2. Committee Members
To the extent that Count I purports to state a claim for malpractice or gross malpractice against the members of the committee acting in their individual capacity, they are entitled to summary judgment as there is no evidence that they were negligent.
II. Direct Constitutional Claim
Count IV asserts a cause of action for a direct violation of the Massachusetts Constitution.
A. Declaratory Judgment Procedure
Moore seeks declaratory relief as to CPCS’ obligation to develop, implement, and maintain a screening procedure for cases appointed to CPCS. The declaratory judgment procedure set forth in G.L.c. 23 lAis not applicable to the governor and the legislative or judicial departments of the government. G.L.c. 231A, §2. CPCS is similar to the former Committee on Probation, which was held to be part of the judicial department. See Massachusetts Probation Ass’n v. Commissioner of Administration, 370 Mass. 651, 657 (1976); Sampson v. Committee on Probation, 8 Mass.App.Ct. 937 (1979) (rescript). The Committee on Probation was created by statute; a commissioner is appointed by the Chief Justice for Administration and Management. G.L.c. 276, §§98 and 99A, repealed by St. 1992, c. 379, §192. Prior to the repeal of §99A, the members of the Committee chose the commissioner of probation and set the standards for probation officers. Today, the Chief Justice for Administration and Management fixes the commissioner’s salary and oversees the commissioner’s work. G.L.c. 276, §98. In addition, the Chief Justice can appoint and dismiss probation officers. G.L.c. 276, §83. Probation officers also have responsibilities which are supervised by the commissioner of probation. G.L.c. 276, §85. Nothing in c. 276 explicitly makes the commissioner or probation officers members of the judiciary.
CPCS was created by G.L.c. 21 ID to plan and coordinate the delivery of public counsel services for the purpose of representing indigent defendants. G.L.c. 21 ID, §1. Its members are appointed by the Supreme Judicial Court, and the Committee appoints a chief counsel of its choosing. G.L.c. 21 ID, §§1, 13. CPCS’s chief counsel and staff attorneys are paid by the state. G.L.c. 21 ID, §13. CPCS is not part of the executive branch. Instead, it has been described as a “statutory agency of the Commonwealth,” German v. Commonwealth 410 Mass, at 447, and as a “governmental entity related to the judiciary.” Machado v. Weld, 2 Mass. L. Rptr. at 112.
Just as the declaratory judgment procedure does not apply to the Committee on Probation and its employees, Sampson v. Committee on Probation, 8 Mass.App.Ct. at 938, so too, it does not apply to CPCS, its members and employees acting in their official capacities. To the extent, therefore, that Moore’s claim for a direct violation of the Massachusetts Constitution seeks declaratory relief, defendants are entitled to summary judgment.
B. Monetary Damages
In Phillips v. Youth Development Program, Inc., 390 Mass. 652, 657-58 (1983), the Supreme Judicial Court noted that “a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief.”[17]' Later, the Supreme Judicial Court considered the claim of two inmates who sought money damages for a violation of their rights as handicapped individuals under article 114 of the Massachusetts Constitution. Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. 156 (1989). Once again, the Court indicated that “a State may not violate a person’s constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights." Id. at 160. However, the Court did not need to rule on the plaintiffs entitlement to money damages as it found that summary judgment had been improperly entered due to disputed questions of fact. Id. at 161.
The viability of a cause of action for money damages based on a violation of the Declaration of Rights, in the absence of a claim cognizable under the Massachusetts Civil Rights Act or some other statute, was considered most recently in Martino v. Hogan, 37 Mass.App.Ct. 710 (1994). Once again, there was no definitive resolution of the question because application of the principles of qualified immunity and the defendants’ lack of participation in the alleged wrong would have barred the plaintiffs’ claim in Martino even if an action for monetary damages could otherwise have been maintained. Id. at 720. Citing Phillips and Layne, the Appeals Court stated the following:
There has been discussion of grounding a cause of action on the State Constitution for violation of its provisions where no statutory avenue for enforcement has been fashioned and made available, [citations omitted] No actual decision on that line has reached the present situation or anything near it. To be considered before such a step is taken is the fact of the existence of §1983 and the State ana *269 logue, our Civil Rights Act, G.L.c. 12, §§11H & 1II: these may be thought, as it were, to occupy the field.
Martino, 37 Mass.App.Ct. at 720.
With respect to McManus acting in his individual capacity, since the law is unsettled as to whether a direct claim can be brought under the Declaration of Rights for money damages, it appears best to deny his motion at this time and allow a full record to be developed. However, the individual members of the Committee in their individual capacity are entitled to dismissal of the action against them purporting to seek money damages under the Declaration of Rights because there is no evidence that any of them participated in the alleged violation of Moore’s state constitutional rights. There is “no reason to suppose that if a direct action were permitted, it would not admit of . . . the doctrine limiting money recoveries against public officials to cases of actual participation.” Martino, 37 Mass.App.Ct. at 720.
IV. Federal Civil Rights Act, 42 U.S.C. §1983 A.McManus in His Individual Capacity
In order to prevail in a Section 1983 action, the plaintiff must show that the defendant deprived him of a right secured by the Constitution or the laws of the United States and that the defendant acted under color of law. See Langton v. Secretary of Public Safety, 37 Mass.App.Ct. 15, 19 (1994). Ordinarily a “public defender does not act under color of state law when performing a lawyer’s traditional functions as counsel to a defendant in a criminal proceeding." Polk County v. Dodson, 454 U.S. 312, 325 (1981).
Even though a public defender is paid by the state, that is insufficient to establish that the attorney is acting under color of state law within the meaning of §1983 because, when properly exercising his or her role, a public defender is in fact an adversary of the state. Id. at 320. A public defender’s role is to advance the “undivided interests of his client” and not to act in concert with the state. Id. at 318-19.
Polk County does not, however, foreclose the possibility that, under certain circumstances, a public defender may act under color of law. Id. at 325. Indeed, in Tower v. Glover, 467 U.S. 914, 920 (1984), the Supreme Court held that, notwithstanding Polk County, where a plaintiff claims that a public defender conspired with state officials to deprive him of his constitutional rights, such a complaint sufficiently alleges conduct under color of state law.
In order to survive a motion for summary judgment, however, Moore must do more than simply allege a conspiracy. See Hahn v. Sargent, 523 F.2d 461, 464 (1975). He has not done so. Even if, as Moore argues, McManus may have had the “state’s interests in mind while he manipulated Moore’s cases,” that is insufficient to create a genuine issue of material fact as to the existence of a conspiracy between McManus and the District Attorney’s office. Indeed, it was the ADA who, at the January 14, 1992, pretrial conference, advised the court that McManus appeared to have a conflict of interest representing both Arseneau and Moore. McManus, therefore, is entitled to dismissal of the 42 U.S.C. §1983 action brought against him in his individual capacity.
B.CPCS Members in their Individual Capacities
The members of the Committee acting in their individual capacities are not immune from suit under 42 U.S.C. §1983, but such a claim may not be based on McManus’ actions because Section 1983 liability cannot be predicated upon a respondeat superior theory of liability. Polk County, 454 U.S. at 325. General allegations of administrative negligence or bald assertions that McManus injured Moore while acting pursuant to the CPCS guidelines are also not enough to state a cognizable Section 1983 claim. Id. at 326. “[T]he official policy must be ‘the moving force of the constitutional violation’ in order to establish the liability of a government body under §1983.” Id. Without offering any evidence in support of his contention, Moore argues that because CPCS failed to comply with G.L.c. 21 ID and failed to properly supervise McManus, the CPCS defendants are liable. Because Moore’s claims are based largely on the alleged actions of McManus and because he points to no evidence that any CPCS policy in and of itself violated his constitutional rights or that the committee members acted to deprive him of his rights, the members of CPCS acting in their individual capacity are entitled to dismissal of the 42 U.S.C. §1983 claim asserted against them.
C.CPCS and the Defendants Acting in their Official Capacity
States and state agencies are not “persons” within the meaning of §1983 so a claim against the Commonwealth or one of its agencies may not be maintained for money damages. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 64-67, 71 (1989). A suit against an individual acting in his or her official capacity is no different than a suit against the state itself. Will, 491 U.S. at 71. Therefore, “neither a state agency nor a state official acting in his official capacity may be sued for damages in a Section 1983 action.” Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1990). See also Hafer v. Melo, 502 U.S. 21 (1991); O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 141 (1993). Accordingly, the defendants are entitled to summary judgment as to Moore’s §1983 claims against CPCS and all the defendants sued in their official capacity.
IV. Collateral Estoppel
Defendants’ argument that Moore’s claims are barred by collateral estoppel because there has been a determination that McManus was not ineffective is unpersuasive. The defendants failed to include collateral estoppel as an affirmative defense in their answer as required by Mass.R.Civ.P. 8(c). Indeed, they did not *270 raise the issue until their reply memorandum in support of defendants’ motion for summary judgment.
In any event, the defendants’ reliance on Aetna Casualty and Surety Company v. Niziolek, 395 Mass. 737 (1985) is misplaced. In Niziolek, the Supreme Judicial Court held that a defendant who was convicted of setting his home on fire and fraudulently collecting the insurance proceeds was estopped from denying in a civil suit that he caused his house to bum with the intent to defraud Aetna. 395 Mass. at 746-47. Unlike Niziolek the issues in Moore’s civil suit are not the same as those presented in his criminal case.
In the criminal case, the issue of McManus’ conflict of interest was first raised in a 1993 pretrial motion to suppress statements and physical evidence. That motion sought to suppress statements made by Dumas and Arseneau and the physical evidence seized on or before December 17, 1991, the date of Moore’s arrest. Moore argued, in part, that because McManus’s later representation of Moore, Dumas, and Arseneau created a conflict of interest, the evidence seized prior to the time in which McManus was Moore’s attorney, and prior to the time that McManus had a conflict of interest, should be suppressed.
Moore’s motion to suppress was denied (Travers, J.) because the conflict of interest with regard to the evidence sought to be suppressed was found to be unproven, without merit, and harmless. Any conflict of interest McManus had in the representation of Moore did not arise until after Moore was arrested and McManus was appointed as his attorney while simultaneously representing Arseneau and Dumas. Such a conflict of interest was not relevant to statements made and evidence gathered prior to the time the conflict arose.
In 1996, after Moore was convicted, he again raised the issue of ineffective assistance of counsel and conflict of interest in a “Motion to Reopen Motion to Suppress Or In The Alternative for New Trial." That motion was denied (Hely, J.) without the court reaching the merits of those claims, and an appeal from that denial is pending.
In the civil action before this court, Moore alleges that McManus’ conflict of interest and his representation of a co-defendant at the grand jury which indicted him while McManus was representing Moore deprived him of his right to effective counsel and constituted malpractice, negligent misrepresentation, fraud and deceit, a violation of his rights guaranteed by the Declaration of Rights, and a violation of 42 U.S.C. §1983. These claims are distinct from Moore’s attempt to use McManus’ conflict as a basis to suppress evidence obtained prior to his representation by Mc-Manus. The reasoning that would support denial of Moore’s motion to suppress would not necessarily support denial of the claims asserted herein. Further, the ruling on the motion to suppress was upon multiple grounds. For collateral estoppel to preclude relitigation of an issue, it must have been actually litigated and essential to the decision in the prior case. Larson v. Larson, 30 Mass.App.Ct. 418, 427 (1991), citing Cousineau v. Laramee, 388 Mass. 859, 863 n.4 (1983). See also Restatement of Judgments Second, §27 illustration 12(h).
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for summary judgment be DENIED and that the defendants’ motion for summary judgment be DENIED in part and ALLOWED in part, as follows:
A. Allowed as to Count I as to all defendants except McManus in his individual capacity:
B. Denied as to Count I as to McManus in his individual capacity;
C. Allowed as to so much of Count II as asserts a claim of willful misrepresentation;
D. Denied as to so much of Count II as asserts a claim for negligent misrepresentation as to McManus in his individual capacity;
E. Denied as to Count III;
F. Allowed as to so much of Count IV that seeks declaratory relief as to all defendants;
G. Allowed as to so much of Count IV that seeks monetary damages as to all defendants except Mc-Manus in his individual capacity;
H. Denied as to so much of Count IV that seeks monetary damages as to McManus in his individual capacity;
I. Allowed as to Count v. as to all defendants.

 To the extent that Count II contains a claim for willful misrepresentation, it is dismissed as duplicative of the fraud and deceit claim asserted in Count III.

 McManus claimed that he talked to Dumas “for a second” to say he couldn’t represent her, but he “certainly never acted as her attorney.”

 There is a dispute as to whether McManus, in fact, represented Moore at his arraignment. McManus states that he was in another court and that another attorney actually handled the arraignment. Moore states that McManus represented him at the arraignment and interviewed him prior to the arraignment at which time Moore told McManus details of his personal life and the circumstances of his arrest.

 McManus claims that since he was about to take a leave of absence, he most likely would not have reviewed any materials with which he was provided if, indeed, he had received them at all.

 At some point, CPCS and McManus also represented Atteridge.

 Moore denies that he was told by McManus on January 7, 1992 or at any other time that a conflict of interest existed.

 Moore’s constitutional claims (Counts IV and V) are not governed by the MTCA. See Jackson v. Hogan, 388 Mass. 376, 380 n.4 (1983).

 In ruling that the Trial Court was not an “agency” within the meaning of G.L.c. 258, §1, the Supreme Judicial Court noted that it had been able to “locate no instance in which the Trial Court or the judicial department as a whole has been considered an agency of the Commonwealth.” Kinan v. Trial Court 400 Mass. 582, 584 (1987).

 CPCS does have a community advisory board appointed by the Committee, but its purpose is to represent the greater Roxbury community and not to govern CPCS. G.L.c. 21 ID, §15.

 The MTCA does not use the words “committee” and “board” interchangeably. G.L.c. 258, §1 defines “executive officer of a public employer” as including “the board, directors, or committee of a district in the case of the public employers of a district.” (emphasis added). In the very next clause, pertaining to “any other public employer,” the Legislature chose to limit the definition of “executive officer” to the nominal chief executive officer or board, eliminating any reference to “committee.” Even if the word “board” could be construed as including a committee, Moore did not address his letters to any individual committee member, and there is no evidence that CPCS has a chairperson upon whom service could be made. Perez v. Amherst-Pelham Regional School Committee, 410 Mass. 396, 398 (1991) (where presentment may be made upon a committee, presentment upon the chairperson is proper). A letter addressed only to the “CPCS” is not directed at anyone who could have investigated Moore’s claims or taken action to settle the matter. See G.L.c. 258, §5.

 Because Moore failed to make a proper presentment on CPCS, it is unnecessary to decide whether Moore’s c. 93A demand letters sufficiently identified the legal basis of his claims under G.L.c. 258, §4.

 Even if McManus is ultimately determined not to be a public employee, Moore may not maintain claims against CPCS or a defendant in his or her official capacity based upon actions of McManus because if McManus is not subject to the direction and control of CPCS, there would be no respondeat superior liability. Kelly v. Rossi 395 Mass. 659, 661 (1985) (test to determine whether an individual is a public employee is the same as that used to determine whether an agent is a servant for whose acts a principal may be liable under the respondeat superior doctrine).

 This court (Lauriat, J.) initially allowed plaintiffs motion for the expenditure of funds to retain an expert, but then reconsidered and denied the motion without prejudice pending a ruling on the defendants’ motion for summary judgment.

 Glenn involved a trial counsel's failure to object to a jury instruction. The Court held that “in order to justify a right to recover, a plaintiff asserting an error of the type Glenn asserts in this case must prove . . . that he is innocent of the crime charged.” 409 Mass. at 707.

 If a direct cause of action for monetary damages may be maintained, in the context of this case, the only proper defendant would be one acting in his individual capacity. Cf. Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71, 77 (1992) (by enacting G.L.c. 12, §§llHand I, the legislature did not waive sovereign immunity).